Dureee, Judge,
delivered the opinion of the court:
Plaintiff, a common carrier by railroad, seeks to recover $47,035.01 in freight charges for transporting a number of carload shipments of military poison gas (lewisite and mustard gas) for defendant from origins in Colorado, Arkansas, Utah and Alabama to Mukilteo and Tulalip, Washington, during the period January 9,1943, through October 17,1944.
During this period, plaintiff and its connecting carriers, at defendant’s request, performed the rail transportation services for defendant herein involved by moving certain articles described on Government bills of lading, variously, as follows:
Gas, Compressed, NOIBN, Poison (Lewisite, Ml)
Gas, Compressed, NOIBN, Poison (Toxic-Gas, HS)
Gas, Compressed, NOIBN, Poison (Toxic-Gas, Ml)
Mustard Gas
M-l Poison Gas
Gas, Poison, NOIBN, Mustard (H)
As stated by defendant in its brief, these articles were “mustard and lewisite.” The bills of lading recited that “poison gas” placards or labels were applied to the cars and shipping containers in which the above-described commodities moved. *190 Several of the bills of lading also stated that military personnel, consisting of one officer and several enlisted men, were to accompany the shipments. One bill of lading stated that 2 officers and 10 enlisted men were to accompany the shipment. This was done in order to insure safety of handling, with particular reference as to having someone in attendance with knowledge of the dangerous propensities of the commodity shipped in case of an accident. The shipments were all made in steel cylinders 81 inches long and 30 inches in diameter, weighing 1,600 pounds empty and 3,000 to 4,000 pounds filled.
Defendant is attacking the application to these shipments of a rating of 65 percent of first class published on “poison gases” in Amendment 6 to Association of American Railroads Section 22 Quotation 14, without land grant deduction. Defendant also asserts the inapplicability of plaintiff’s alternate rate basis consisting of class one (later class 3) named in Item 21025 of Consolidated Freight Classification 15 for “gases, compressed, noibn, poison, in steel cylinders” with land grant deduction. Plaintiff seeks to recover either of these rate bases, whichever results in the lower charge. The Trial Commissioner has found that under either of these two rates the sum of $47,035.01 would be due plaintiff.
Amendment No. 6 to A.A.R. Section 22 Quotation 14 — A, effective November 9,1942, provided a rating of 65 percent of first class without land grant deductions on “gases, poison.”
The General Accounting Office has discovered what it regards as a flaw in the application of the quotation rating on “poison gas” to shipments of mustard gas and lewisite. It points out that both lewisite and mustard gas, as shipped, were liquids and cannot therefore be considered “gases” within the meaning of the quotation rating on “poison gases.” The same argument is made with respect to plaintiff’s alternate rating named in Item 21025 of Consolidated Freight Classification 15.
Mustard gas and lewisite are liquids at ordinary temperar ture and atmospheric pressure. Unlike such toxic warfare agents as phosgene and chlorine gas, which are in an aerified state at normal temperature and atmospheric pressure, mustard gas and lewisite need not be subjected to pressure to be reduced to a liquid.
*191 Mustard gas (known to the chemist as dichlorodiethylsul-fide) is a colorless (if pure) to yellow or brown oily liquid. Its low volatility and vapor pressure give rise to its> per-sistency, a desirable characteristic of toxic warfare agents. Because of its persistency, it is used as a military defense weapon to prevent the occupation by hostile forces of ground evacuated on withdrawal. It is dispersed over an area in aerosol form by action of an explosive burster in the bomb or shell in which it is loaded.
Lewisite (chorvinyldichlorarsine) is a colorless light amber liquid. It is similar in use and effect to mustard gas and, like mustard, is classed as a vesicant gas, meaning that it produces inflammation, blistering, 'and destruction of human tissue. Unlike mustard, lewisite contains arsenic and is therefore a systemic poison as well.
Both mustard gas and lewisite, although liquids, are by common meaning and usage, particularly in defendant’s toxic warfare services, known as “gases.” The Trial Commissioner found that “by long and well-established tradition in the Chemical Warfare Service, all chemical agents, regardless of their physical state, are known as ‘gases.’ ” His finding is clearly supported by the following evidence:
Both mustard gas and lewisite are used as “war gases” which are defined in defendant’s technical manuals as a “chemical, irrespective of its physical state, whose toxic properties may be effectively exploited in the field of war.” One of the definitions in Webster’s New International Dictionary defines “gas” as follows: "Any substance, whether gaseous, liquid, or solid under ordinary conditions', used to produce a poisonous or irritant atmosphere, as in the World War.” [Emphasis added.] A technical dictionary refers to mustard gas as a “deadly vesicant war gas.” Under Interstate Commerce Commission’s regulations effective January 7, 1941, rail cars containing lewisite and mustard gas bad to be placarded “poison gas,” and a “poison gas” label applied to the exterior of mustard gas and lewisite containers. The reason liquid warfare agents are known as “gases” is explained by the history of such agents set forth in defendant’s Technical Manual TM 8-215: “The first war gases were literally gases — that is, they were in a gaseous state; hence the origin *192 of terms such as ‘gas warfare’ and ‘gas mask.’ ” These terms were short and convenient, and continued in use even after introduction of toxic liquids and solids such as nmstard (which is a liquid at ordinary temperatures), and vomiting gases (which are finely divided solid particles). * * * [Emphasis supplied.] To the chemist, “poison gas” is a misnomer if applied to mustard (or mustard gas), and “liquid blister gas” is a contradiction of terms. In its war application, however, “poison gas” (or even “gas”) is a specialized military term, sanctioned by long usage in Department of the Army and Chemical Warfare Service publications. The designation “mustard gas’'’ for a liquid warfare agent established that the term “gas” in common usage applies to toxic warfare agents regardless of their physical state. Defendant’s own expert on toxic warfare agents testified that mustard “is called a gas by tradition.” He referred to mustard as “mustard gas, notwithstanding the fact that it is a liquid.”
Item 21025 of Consolidated Freight Classification 15 named a carload rating of first class and later third class on “gases, compressed, noibn, poison in steel cylinders.” Plaintiff seeks to apply this rating, less land grant deduction, alternatively with the Quotation 14 rating on “poison gases” without land grant deduction, whichever basis produces the lower charge. Actually, the rate claimed by plaintiff in this case is the same under either alternative.
Defendant asserts that this CFC 15, Item 21025 rating is inapplicable not only because mustard (or mustard gas) and lewisite are not “gases,” but also because they are not “compressed” poison gases. Defendant points out that mustard and lewisite, unlike phosgene and chlorine gas, need not be subjected to pressure to be reduced to a liquid. As a result, mustard and lewisite are not, strictly speaking, “compressed” poison gases.
Plaintiff contends, however, that Item 21025 of CFC 15 is properly applicable under the rule of classification by analogy contained in Rule 17 of the classification. This rule provides in part :
“When articles not specifically provided for, nor embraced in the classification as articles ‘noibn’ are offered for transportation, carriers will apply the classification *193 provided for articles which, in their judgment, are analogous; * *
On May 19, 1945, following these rate negotiations, the Chief of Transportation of defendant’s Army Service Forces, wrote the Association of American Railroads requesting a further reduction to 37% percent of first class on a number of toxic warfare agents including mustard gas and lewisite. In so doing, he said:
“At the present time two of the articles, namely, Mustard Gas and Lewisite are being shipped as compressed gases, NotbN, poison, and thus are subject to the basis of rates described in A.A.R. Section 22 Quotation 14-A which provides for 65 percent of the first class rate, plus scale of increases provided under Tariff X-148 or the commercial rate of Class 70, less Land Grant deductions, whichever is lower.”
Attached to this letter was a statement reciting that the applicable class rating on mustard gas and lewisite was Item 21025 of CFC 15 — one of the alternative ratings plaintiff seeks to recover here. This rating was later confirmed in defendant’s joint Army and Air Force Commercial Traffic Bulletin No. 23, dated September 21, 1951, which showed a rating for “Lewisite” and “Mustard” under Item 21025 of CFC 19 for “Poison Gas, NOIBN.”
The tariff relied on by defendant is a commodity rate, less land grant deduction named in Item 2370 of Trans-Continental Freight Bureau Tariff 4-U for shipments of “* * * Chemicals, NOIBN” (not otherwise identified by name) “in carboys, in cans or cartons in boxes, in moisture proof bags, * * * or in bulk in barrels.”
This tariff would produce the lowest rate, and if it is applicable to these shipments, the Trial Commissioner has found that nothing would be due plaintiff.
Item 5 of Section 22 Quotation 14-A relied upon in part, provided:
“* * * nothing in this quotation shall deprive the Government of the right to avail itself of any published tariff rate to which it lawfully is entitled * *
This court has repeatedly held that the Government is at all times entitled to the lowest published tariff rate, and that *194 Government officers and agents are without authority to contract for higher than published rates for like services under like conditions. U.S. Lines Operations, Inc. v. United. States, 99 Ct. Cl. 744 (1943) cert. denied 321 U.S. 775 (1944); Missouri Pacific Railroad Company v. United States, 71 Ct. Cl. 650 (1931); Illinois Central R. Co. v. United States, 58 Ct. Cl. 182 (1923).
The tariff relied upon by defendant expressly excludes “Gases of any description” except phosgene and chloropicrin, whereas the tariffs relied upon by plaintiff refer either to the “movement of poison gases in containers between arsenals” or to “compressed poison gases.” From an analysis of all the evidence relating to the meaning of “poison gas,” we conclude that this term both in its technically accepted sense, in common usage and definition, and in the clear contemplation of the parties as to these shipments, included “mustard,” “mustard gas,” and “lewisite.” The military shipments of these highly poisonous and dangerous liquids in 1,500-pound cylinders, three feet in diameter and eight feet long, with special valves and safety plugs, and under special Interstate Commerce Commission safety regulations for shipping, certainly at least indicates that “poison gas” cannot be considered under a lower commodity tariff description of “Chemicals, NOIBN,” contained in “barrels or drums” as provided in Consolidated Freight Classification No. 15, Section 3(b), Rule 5. Even though classifications of commodities under safety regulations are not determinative of classifications of the same commodities for rate making purposes, they are at least illustrative of the accepted meaning of the terms involved in this case.
While mustard and lewisite are not, strictly speaking, “compressed poison gases,” as described in Item 21025 of Consolidated Freight Classification 15, we also conclude that under the rule of analogy as previously applied by this court,[1] and as expressly agreed to by the Government during the negotiations for this rate, these two liquids are by analogy much nearer and more definitely related to “compressed poison gases” than to “Chemicals, NOIBN” under the attendant circumstances in this case. We also rely upon the *195 applicability of the description of “gases, poison” under A.A.R. Section 22 Quotation 14-A to the shipments at issue.
Judgment is entered for plaintiff in the sum of $47,035.01.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Minnesota and is a common carrier by railroad in interstate commerce over its own line and jointly with other lines.
2. During the period January 9,1943, to October 17,1944, the plaintiff and its connecting carriers, at defendant’s request, performed rail transportation services for defendant by moving certain articles described on Government bills of lading, variously, as follows:
Gas, Compressed, noibn,[1] Poison (Lewisite, Ml)
Gas, Compressed, noibn, Poison (Toxic — Gas, HS)
Gas, Compressed, noibn, Poison (Toxic — Gas, Ml)
Mustard Gas
M-l Poison Gas
Gas, Poison, noibn, Mustard (H)
[1] Not otherwise indexed by name.
The bills of lading recited that “poison gas” placards or labels were applied to the cars and shipping containers in which the above-described commodities moved. Several of the bills of lading also stated that military personnel, consisting of one officer and several enlisted men, were to accompany the shipments. One bill of lading stated that 2 officers and 10 enlisted men were to accompany the shipment. This was done in order to insure safety of handling, with particular reference as to having someone in attendance with knowledge of the dangerous propensities of the commodity shipped in case of an accident.
3. Thirty-eight carloads of these commodities, covered by 35 bills of lading, originated at Clover, Utah, Baldwin, Arkansas, and Ladora, Colorado, and were destined to Tula-lip and Mukilteo, Washington. Nine shipments thereof, *196 covered by 30 bills of lading, originated at Huntsville, Alabama, were stored in transit at Clover, Utah, and Tulalip, Washington, and were subsequently forwarded to Mukilteo, Washington.
4. The shipments were made in “1-ton containers.”
The 1-ton containers, which were used for these shipments, are heavy steel cylinders weighing about 1,600 pounds empty and from 3,000 to 4,000 pounds filled, depending on the type and quantity of the filling. They are made of steel and are about 81 inches long by 30 inches in diameter.
The type “D 1-ton container,” used for the storage and movement of such chemical warfare agents as mustard gas, is fitted with two eduction tubes which permit venting the vapor formed in the cylinders when the liquid mustard gas or lewisite is put into, or removed from, the cylinders. Exterior valves on these cylindrical containers are indented and capped or hooded to prevent rupturing of the valves during handling. These containers also are equipped in their rear heads with safety plugs which, in the event of excessive pressure built up by filling, will break loose and prevent the container from bursting.
5. Department of the Army Technical Manual, TM 3-215 (also bears Department of the Air Force designation AFM 355-7), has as its purpose the providing of a source of practical information on chemical agents — their classifications; chemical, physical, and physiological properties; use in the field; etc. This manual defines “war gas,” as follows:
p. War Gas. A chemical, irrespective of its physical state, whose toxic properties may be effectively exploited in the field of war.
Note: The first war gases were literally gases — that is, they were in a gaseous state; hence the origin of terms such as “gas warfare” and “gas mask.” These terms were short and convenient, and continued in use even after introduction of toxic liquids and solids such as mustard (which is a liquid at ordinary temperatures), and vomiting gases (which are finely divided solid particles) . To the chemist, “war gas” is a misnomer if applied to mustard, and “liquid blister gas” is a contradiction of terms; in its war application, however, “war gas” (or even “gas”) is a specialized military term, sanctioned by long usage in Department of the Army *197 publications. The terms “toxic agent” and “toxic chemical agent” are coming into increased use and are preferred at all times except when the warning “gas” is shouted in the field.
6. According to the dictionary’s definition (Webster’s New International Dictionary, Second Edition, Unabridged, 1947), the term “gas” refers to and includes:
1. An aeriform fluid, having neither independent shape nor volume, but tending to expand indefinitely. See kinetic theory oe gases. The term was used at first by chemists as synonymous with air, but afterwards applied to all fluids that could not be liquified by pressure at any attainable temperature, as oxygen, hydrogen, etc., in distinction from vapor, as steam, which becomes liquid on a reduction of temperature. As commonly used, gas is applied to the gaseous state of a substance best known in that state, while vapor is used of the gaseous state of a substance best known as a liquid or solid, or of the gaseous state thought of in relation to the liquid or solid state. See liquid, n., 1.
2. In popular usage, any gas? or gaseous mixture, with the exception of atmospheric air; specif.: a Any gas used to produce anesthesia, as laughing gas (nitrous oxide) or ethylene, b Any combustible gaseous mixture used for illuminating or as a fuel; as natural gas, coal gas, etc.
Composition oe Combustible Gases
% ‡ $ * ‡
3. Any substance, whether gaseous, liquid, or solid under ordinary conditions, used to produce a poisonous or irritant atmosphere, as in the World War. Gases in the usual sense, as chlorine, may be discharged from cylinders in which they have been compressed, but liquids and solids must be volatilized by heat or hurled in shells or bombs. If the substance is in the air in the form of fine solid particles instead of gas, it is called a smoke. War gases are classed, according to their effects, as asphyxiating (lethal), lachrymatory (tear-producing), sternutatory (sneeze-producing), vesicatory (blistering) etc.
$ # ‡ ^ ‡
7. Mustard gas (referred to chemically as dichlorodiethyl sulfide) is a colorless (if pure) to yellow oily liquid, and in strong concentrations, it has an odor resembling horseradish *198 or mustard. Unlike phosgene and chlorine gas, mustard gas need not be subjected to pressure to reduce it to a liquid because it is a liquid at ordinary temperatures and at atmospheric pressure. It has a low volatility and hence is relatively persistent, lasting in the field and retaining its effectiveness from one day to several weeks, depending on conditions of climate, temperature, and terrain. Because of this, it is particularly adaptable for use as a military defense weapon to prevent the occupation, by hostile troops, of ground evacuated on withdrawal. It is loaded in explosive bombs or shells and is dispersed over an area, in an aerosol form, by action of an explosive burster in the bomb or shell.
8. From the standpoint of its physiological effect, mustard is classified as a “vesicant gas,” which means that it produces inflammation, blistering and destruction of human tissue. In addition to the gas mask, protective clothing is required to guard against its effects. A technical dictionary refers to mustard as a “deadly vesicant war gas.” Another states that it is not only “especially dangerous” but also requires “great care” in its storage and handling.
9. Under Interstate Commerce Commission Regulations for Transportation of Explosives and Other Dangerous Articles by Freight, effective January 7,1941, both mustard gas and lewisite were classified as “Extremely Dangerous Poisons — Class A,” requiring special metal cylinders for their shipment, application of “poison gas” placards to the exterior of freight cars, and “poison gas” labels to the exterior of packages. The chief danger in its transportation is the possibility of leakage and contamination of persons and property.
10. Lewisite (referred to chemically as chlorvinyldi-chlorarsine) is a colorless to light amber liquid with an odor which faintly resembles that of geraniums. It is similar in use and effects to mustard gas and, like mustard, it is classed as a vesicant gas. In addition, it is a systemic poison and lung irritant.
11. Historically, the first chemical warfare agents used by the military in this century were gases in their natural state. *199 Examples of such, poison gases are phosgene and chlorine. When liquid chemical warfare agents, such as mustard gas and lewisite, were introduced later, the designation “gas” was carried over and applied to them. By long and well-established tradition in the Chemical Warfare Service, all chemical agents, regardless of their physical state, are known as “gases.”
12. Effective March 17, 1942, Consolidated Freight Classification Number 15 (hereinafter CFC No. 15) provided the following ratings:

*200 Effective September 2, 1943, Item 21025 was amended to read as follows:

13. Rule 17 of said classification, entitled “Classification by Analogy,” provided as follows:
When articles not specifically provided for, nor embraced in the classification as articles “noibn”, are offered for transportation, carriers will apply the classification provided for articles which, in their judgment, are analogous ; in such cases agents must report facts to proper officer of Freight Department in order that rating applied may be verified and necessary classification provided. This rule will not apply in connection with ratings or rates published in Exceptions to the Classification or in commodity tariffs.
14. On October 7, 1942, Maj. R. M. Boyd, Chief, Freight Branch, Office of the Chief of Transportation, War Department, wrote the Southern Classification Committee (a railroad rate-making organization), asking for the proper classification for shipments of mustard gas. The letter stated:
The question of proper classification description and rating applicable to Mustard Gas has been referred to this office. Movement involved wa,s from Huntsville, Alabama to Suffield, Alberta? Canada.
Information from Chemical Warfare Service discloses that this is a [v] esicant gas, type A poison, in liquid form, shipped in 55 gallon drums, not compressed.
It is the opinion of this office that Chemicals, noibn, is properly applicable. Your early advice will be appreciated.
*201 15.The Southern Classification Committee replied to this request for its own account on October 10,1942, and for the account of the Official and Western Classification Committees on October 12, 1942. Its letter of October 10, 1942, to the War Department, stated:
Liquid Mustard Gas in steel drums is ratable by analogy as Poison Gas, noibn, in steel cylinders.
_ For your information, the Bureau of Dangerous Articles _ (Agent Topping) advises emergency regulations permit shipment of Liquid Mustard Gas in steel drums and when so shipped is more dangerous than compressed in steel cylinders.
16.Following this ruling, Major Boyd, on behalf of the War Department, wrote the Western Classification Committee to establish “a more reasonable rating than first class” on shipments of mustard gas in 1-ton-steel containers. His letter, dated June 23,1943, stated:
This will acknowledge your letter of June 21, 1943 file RCF relative to shipments of phosgene, mustard Sas and chloropicrin in 1 ton steel containers, Types . and D.
The movement of these commodities in these containers is not entirely in carloads, there being LCL shipments as well. The weight of these containers filled is approximately 3,400 pounds. Chemical Warfare Service have 41 of these multiple unit cars. Fifteen (15) of these filled containers are loaded on one of these special cars, weighing approximately 51,000 pounds. The Chemical Warfare Service have leased from the Union Pacific 44 gondolas in which these loaded containers are also shipped. These gondolas accommodate eighteen (18) of these loaded containers (floor loading only) weighing 61,200 pounds. It is evident from these facts that these containers loaded with these various commodities should carry a more reasonable rating than first class carloads. Your kind consideration will be greatly appreciated.
17.On July 28, 1943, the Western Classification Committee responded to the War Department’s letter of June 23, *202 1943, advising that the Committees had reduced the class rating on compressed-poison gases contained in Item 21025 oí CFC No. 15 from first to third class. The third-class rating went into effect on September 2,1943, on all traffic except California intrastate traffic, as provided by Supplement No. 34 to CFC No. 15. During the entire course of these negotiations, the class rating on “Chemicals, noibn” in carboys was third class; and on “Chemicals, noibn” in barrels, boxes, steel pails, moisture-proof bags, and tank cars was fourth class in the East, fifth class in the South, and Class A in the West.
18. Following the reduction in the class ratings on compressed-poison gases from first to third class, the Office of the Chief of Transportation of the War Department, on November 19,1943, sent a joint letter to the Western, Official, and Southern Classification Committees, requesting a first-class rating on shipments of mustard gas with a lower minimum weight of 10,000 pounds. Said letter was captioned: “* * * (Container, Steel, 1 Ton, Types A and D, filled with mustard gas, chloropicrin and phosgene),” and stated, in part, as follows:
* $ * % *
In consideration of the circumstances surrounding the movement of these containers filled with the various commodities, it is the opinion of this office that to have to pay on the basis of 3rd class carloads, min. wt. 30,000 pounds on a shipment, for instance, of two containers filled with chloropicrin and weighing 6,620 pounds is unreasonable. Since it is an impossibility to publish LCL ratings due to Emergency Conditions Instructions No. 3 of the Bureau of Explosives, this office believes that the situation should be relieved by amending items 10495-A, 10545-A and 21025-A in supplement 34 to CFC No. 15 to provide for an alternate carload minimum weight. It is the request of this office that a carload provision be provided for 10,000 pound minimum at 1st class. * * *
*203 was written, the less-than-carload rating on shipments weighing 10,000 pounds or less of “chemicals, noibn” in carboys was first class, and in barrels, boxes, steel pails, or in tank cars, second class, as contained in Item 10515 of CFC No. 15.
19. By letter dated November 9, 1942, addressed jointly to the War and Navy Departments, entitled “Amendment No. 6 to A.A.R. Section 22 Quotation No. 14 — Explosives,” the Association of American Railroads amended that quotation to provide that the rating of 65 percent of first class without land-grant deduction contained therein would thereafter apply on “Gases, poison; ”. This amendment to A. A.R. Section 22 Quotation No. 14 was requested by Major Boyd of the War Department in a letter to the Association of American Railroads dated October 17,1942. Said letter stated:
Reference is made to your letter of October 12, 1942, file 3-3060-4 requesting the opinion of this office as to whether poison gas moving between two arsenals is covered by Section 22 Quotation No. 14.
It is the opinion of this office that the quotation in question covers poison gas only when it is in the form of ammunition, such as bombs, grenades, projectiles, etc. In this connection, however, advice has been received which indicates that there is a movement of poison gases in containers between arsenals. It is requested, therefore, that the quotation be amended to include “Gases, ■Compressed, noibn, poison”. In order to avoid limiting application of rates on this commodity to ammunition, the entry apparently should be flush with the caption in the description.
$ $ $ $ $
20. The Government based its deductions for these shipments from plaintiff’s later bills on the commodity rate contained in Item 2370 of Trans-Continental Freight Bureau West-Bound Tariff No. 4-U (hereinafter TCFB No. 4-U), less land-grant deductions. That item provided for commodity rates as follows:

*204

Section 2 of Item 2370, to which the above provisions referred, provided that the said commodity rate applied on “Chemicals, noxbn, in carboys, in cans or cartons in boxes, in moisture-proof bags, as described in Note 2, or in bulk in barrels.”
21. As provided in Note 1 of Item 2370 of TCFB No. 4-U, the rates named therein did not apply to “gases of any deserip *205 tion,” with certain immaterial exceptions. This restriction applied both to mixed carload shipments of different commodities and to straight carload shipments of a . single commodity.
22. On May 19, 1945, the Chief, Traffic Control Division, Office of Chief of Transportation, Army Service Forces, wrote to the Association of American Railroads, asking for a rate on mustard gas and lewisite of 37% percent of first class. In so doing, it admitted that those commodities were subject to the class rating of third class less land-grant deduction, or to the basis of rates named in A.A.R. Section 22 Quotation No. 14-A. Said letter reads, in part, as follows:
Request is made that the carriers establish 37% percent of the 1st class rate for application between points in the United States (except for traffic moving between Pacific Coast points on the one hand and stations east of the Rocky Mountains on the other hand) to apply on carload shipments of poison gas, military, in tank cars or in packages as provided for in the Consolidated Freight Classification, viz.:
Chlorine, liquefied
Compressed gases, noibn, poison
Carbonyl Chloride, phosgene
Chloracetophenone
Chloropicrin
Diphenylaminechlorarsine
Minimum Weight 50,000 pounds.
At the present time two of the articles, namely, Mustard Gas and Lewisite are being shipped as compressed gases, noibn, poison, and thus are subject to the basis of rates described in AAR Section 22 Quotation 14 — A, which provides for 65 percent of the first class rate, plus scale of increases provided under Tariff X-148 or the commercial rate of Class 70, less Land Grand [sic] deductions, whichever is lower. The balance of these articles are specifically provided for in the classification and are subject to the basis of rates as shown in Exhibit No. 1. In many cases commodity rates cover specific movements.
Exhibit No. 1 attached, shows the classification description of these commodities, the military description and military symbol as well as the chemical description and shows also the classification rating and minimum weight, together with exception ratings and minimum weights where the latter are published. In addition this exhibit *206 shows classification ratings and exceptions of analogous articles for comparison purposes.
*****
Exhibit 1, attached to the said letter of May 19,1945, stated that the applicable classification description for both mustard gas and lewisite was “Compressed Gases, noibn, Poison” as contained in Item 21025 of CFC No. 15 and named a rating of Class TO (third class).
23. In the Joint Army and Air Force Commercial Traffic Bulletin No. 23, dated September 21,1951, the Departments of the Army and the Air Force rated lewisite and mustard gas, under Item 21025 of Consolidated Freight Classification
No. 19, as follows:
*****
Lewisite, L_Poison gas, noibn
*****
Mustard-T Mixture, H.T-Poison gas, noibn
Mustard, H-Poison gas, noibn
Mustard, simulated ME,_Poison gas, noibn
Mustard, distilled, H.0-Poison gas, noibn
Jje # !jt # *
24. If the court holds that the first- (and later third-) class rating named in Item 21025 of CFC No. 15, less land-grant deduction, or, in the alternative, 65 percent of first class as named in A.A.E. Section 22 Quotation No. 14, without land-grant deduction, are applicable on these shipments to the exclusion of Item 2370 of TCFB No. 4-U, plaintiff is due the sum of $47,035.01. If, however, the court should find that the commodity rate named in Item 2370 of TCFB No. 4-U is applicable to these shipments, plaintiff has been paid in full and is due nothing.
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States the sum of Forty seven thousand thirty five dollars and one cent ($47,035.01), and judgment is entered to that effect.

 Erie Railroad Co. v. United States, 79 Ct. Cl. 102, 109 (1934).