we do not agree. The contracting officer, or his duly authorized representative, admitted a change in the plans and procedure of construction and by change order "C" dated June 21, 1949, paid plaintiff $1,790 as part of the extra expense incurred by reason of such change. Plaintiff's protests were adequate. The remainder of plaintiff's claim amounting to $2,506 was denied by letter dated June 27, 1949, on the ground that it was a claim for unliquidated damages for breach of contract, notwithstanding the fact that both of plaintiff's claims for $1,790 and $2,506, were founded on defendant's failure to follow the sequence of work set forth in the specifications. The letter dated August 26, 1949, upon which defendant relies, refers to the June 27, 1949, letter and appears to be no more than an affirmation of that decision which clearly was not decided on a question of fact. No findings of fact were made by the contracting officer. Even if the August letter is considered by itself the most that can be said for defendant is that it is ambiguous. Certainly if the contracting officer's decision is to be accorded finality it should be unequivocal and clear enough to apprise plaintiff of whether it was based on a question of fact or law so that plaintiff can reasonably determine whether an appeal is warranted. When the decision is ambiguous, as the August letter is, we must look to the surrounding circumstances to determine its meaning. In so doing we conclude that the contracting officer's decision was based on a question of law and, therefore, it was unnecessary for plaintiff to take an appeal therefrom. Southeastern Oil Florida, Inc., v. United States, 127 Ct.Cl. 480; Cramp Shipbuilding Co. v. United States, 122 Ct.Cl. 72, 99; Continental Illinois National Bank & Trust Co. v. United States, 101 F. Supp. 755, 121 Ct.Cl. 203, 246; Pottsville Casting & Machine Shops v. United States, 101 F.Supp. 370, 121 Ct.Cl. 129; Anthony P. Miller, Inc., v. United States, supra, 77 F.Supp. 209, 111 Ct.Cl. at page 330.

The plaintiff claims $500 as overhead in its petition but offered no proof on the matter and failed to mention it in its briefs. Therefore, that item is disallowed. The plaintiff is entitled to recover $2,506.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.

**MOTOR CARGO, Inc.,**

v.

**The UNITED STATES.**

No. 49626.

United States Court of Claims.
Oct. 5, 1954.

James L. Givan, Washington, D. C., for plaintiff. Turney & Turney, Washington, D. C., were on the briefs.

Edward L. Metzler, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

Plaintiff sues the United States for the difference in what has been paid it for the carriage of some 237 shipments of gun controls or power drives from the plant of Webster Electric Company at Racine, Wisconsin, to the Navy at York, Pennsylvania, and Martins Ferry, Ohio, and the amount to which it claims it is entitled. The question presented in each instance is the proper classification of the articles carried.

Defendant contends that they should be classified as machinery or machines N. O.

I.,[1] sometimes written noibn, or gun mount parts, for the carriage of which plaintiff would be entitled to either $46,479.99, or $47,292.53, depending upon whether they are properly classifiable as machinery or machines N. O. I., or as gun mount parts.

On the other hand, plaintiff contends that they should be classified as anti-aircraft directors, for which the tariff provides a rate of $96,456.78; or, if they are not properly classifiable as such, then it is at least entitled to the sum of $81,243.53, because this is the rate applicable to machine gun parts, and the parties had an agreement that they would be so classified and bills of lading issued accordingly.

The parties are not in serious dispute about the law of the case. They agree that a carrier is obliged to file with the Interstate Commerce Commission tariffs covering articles to be transported, and that the freight collectible is governed by these tariffs. They also agree under section 22 of the Interstate Commerce Act, 24 Stat. 387, as amended, a carrier is not prohibited from carrying articles for the United States at a rate less than that provided for in its tariffs.[2] Our problems, therefore, are, first, to determine the proper classification for these power drives or gun controls, by whichever name they are called; and, second, to determine whether there was an agreement between the parties to carry them at a lesser rate. Neither contends that the United States and the carrier could lawfully enter into a contract to carry them at a rate greater than that applicable to that classification into which they fall.

Frequently the tariffs filed with the Interstate Commerce Commission do not specifically describe the article carried, but the rule is that the classification which comes nearest to a description of the article carried determines the rate to be collected, if it can fairly be said

1. A common abbreviation employed in tariffs meaning "Not otherwise indexed by name."

2. Sec. 22, 49 U.S.C.A. provides: "Nothing

in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States".

that the article comes within that classification. Union Pacific Railroad Co. v. United States, 93 F.Supp. 617, 117 Ct.Cl. 757, 764; United States v. Gulf Refining Co., 268 U.S. 542, 546, 45 S.Ct. 597, 69 L.Ed. 1082. Gun controls or power drives are not specifically named in any tariff filed by the carrier with the Interstate Commerce Commission.

Plaintiff's first position is that the articles carried were anti-aircraft directors, or that they were at least in the nature of anti-aircraft directors, and should be classified as such, and that it is entitled to collect the rate applicable thereto.

An anti-aircraft director is a complicated piece of electronic equipment. It is designed to locate an airplane, to determine its speed, its distance from the ship, its direction of flight, and, in short, to ascertain and to evaluate the various factors to insure that a projectile fired from an anti-aircraft gun will hit the target, that is, to insure that the projectile and the target will arrive at the same place at the same time. These factors are many. Among others, in addition to those mentioned above, they concern wind velocity, temperature of the air, ballistics of the gun, the speed and the pitch and roll of the ship, etc.

Prior to the invention of the gun control or power drive, all of this data, when determined and assimilated, was transmitted to the gun crew, which manually operated the gun in an effort to obey the directions of the anti-aircraft director. Since an aircraft moves very fast and its course is constantly changing, it has been found to be almost impossible, from the very inception of anti-aircraft fire, for a gun crew to receive and apply the data furnished by the anti-aircraft director quickly enough for the projectile to arrive at the desired place at the right time. The gun control or power drive was invented in an effort to supply instantaneous compliance with the data furnished by the anti-aircraft director. Without such a device, the data ascertained and supplied by the anti-aircraft director was of but little value, however accurate that data might be.

The Navy employed the Sperry Gyroscope Company to perfect a gun control which would react instantly to the data furnished by the anti-aircraft director. What the Sperry Gyroscope Company invented has been described in the testimony by experts in this field. Their explanation is of a highly scientific nature and difficult for a layman to understand. Nor do we think it is necessary to describe it in detail; all that needs to be said for the purposes of this case is that this gun control or power drive consists of an electronic receiver for the reception of signals from the anti-aircraft director which, through a series of other electronic devices, pistons, and gears, causes the gun to move immediately to the point where the director has determined it is necessary for it to be moved in order for the projectile to arrive at the same place and at the same time the target arrives there.

When an airplane is spotted, the gun may be at a direction and elevation quite different from that necessary for the projectile to strike the target. The director determines the necessary direction and elevation. In response to the electrical signal received from the director, the gun control, or power drive, points the gun at the direction and elevation indicated by the director. After this has been done, it may still be undesirable to fire the gun. It is frequently preferable to follow the target with the gun for a more appropriate time for firing. The anti-aircraft director continues to transmit to the gun control or power drive the necessary data for the movement of the gun to coincide with the movement of the target, and the gun control continues to move it accordingly.

In this day of tremendously high speed of airplanes, of their ability to constantly change direction and elevation, it is obviously impossible for any gun crew to follow such a target in response to the directions of the anti-aircraft director. This can only be done through the medium of an electronically controlled power drive, which acts in perfect consonance with the signals received from the director.

All of this leads us to conclude that the gun controls or power drives in question in this case were a necessary complement of the anti-aircraft director, if not a component part of it. It was not physically a component part of it, because the director was almost always located at a different part of the ship from the gun control or power drive, which was always located on the gun. The director customarily directed not only one gun, but two or more guns, in addition to searchlights. But while the gun control or power drive was not a physical part of the director, it certainly was a necessary complement of it; that is to say, it was something necessary to have in order for the director to accomplish its purpose. Looked at in this way, we think it is fair to say that the director and gun control or power drive were each parts of the whole mechanism necessary for the direction of the anti-aircraft gun.

It can fairly be said, therefore, that a gun control or power drive comes close to the tariff classification of an anti-aircraft director. It is not a complete anti-aircraft director, but it is not inaccurate to say that it is a part of it, a necessary part, without which the data collected and assimilated by the other part is of no avail.

But the defendant says that it is properly classifiable as machinery or machines N. O. I., or gun mount parts.

It seems quite obvious to us that it is not a gun mount part. The gun mount is the thing upon which the gun rests. The gun control or power drive had nothing to do with the support of the gun. It directed the gun, but did not support it. There are many varieties of gun mounts which function entirely without an attached gun control or power drive of the type here involved.

Machinery or machines N. O. I., as a tariff classification, embraces a multitude of things. It would embrace a concrete mixer; it would embrace a harvester for the harvesting of wheat; it would embrace a motor; it would embrace all sorts of things that were not specifically named in the tariff. It is a catch-all expression. Of course the gun control or power drive was a piece of machinery, but this is like saying that a man is an animal. One is hardly more descriptive than the other.

Of the alternative classifications, the one contended for by the plaintiff, and the two contended for by the defendant, certainly the article in question comes much closer to the classification contended for by the plaintiff. It does not come exactly within that classification unless within it there is included anti-aircraft directors or parts thereof. It was not a complete anti-aircraft director, but it was a necessary part of one, or a necessary adjunct to it. It unquestionably directed the gun, but only in the way in which it had been told by the other part of the mechanism. In our opinion the classification that comes nearest to describing the gun control or power drive is "anti-aircraft director."

The gun control or power drive was a new device. It was developed by the Sperry Gyroscope Company in 1942, at the request of the defendant. When defendant approached plaintiff to inquire if it was in position to handle shipments of these articles, it gave plaintiff some idea of their nature, but did not disclose to it its exact nature. The Navy was undertaking to keep secret this invention. Employees from another section of the Webster Electric Company were not permitted in the section where these gun controls were being manufactured. When they were assembled and ready for shipment, they were crated in boxes and placed in the trucks without the plaintiff's truck driver knowing what they were.

Whatever the defendant may have told plaintiff as to the nature of them, however, led it to believe that they were electric anti-aircraft directors, because after defendant had requested it to carry these articles, it applied to the Interstate Commerce Commission for authorization to establish a freight rate on "electric directors anti-aircraft." This application was refused because the In-

terstate Commerce Commission said there was already a classification of anti-aircraft directors, and, therefore, there was no necessity for a separate classification of "electric directors anti-aircraft." It is apparent, however, that plaintiff was under the impression that these articles were just what it said they were in its application to the Interstate Commerce Commission, to wit, "electric directors anti-aircraft."

The freight for the carriage of such articles was at the first class rate, which would have entitled plaintiff in this case to the sum above stated, of $96,456.78. The Navy apparently was uncertain about their proper classification and wanted them carried at a lower rate; naturally they wanted them carried at the lowest agreeable rate. Since there was doubt as to their proper classification, the parties had a conference, attended by representatives of the Webster Electric Company, the carrier, the Navy, and the York Safe & Lock Company. The man representing the plaintiff at this conference was Allen Barr, its traffic manager. He died before his testimony could be taken, and plaintiff has not been able to prove by any competent testimony just what arrangement was agreed upon at this conference. Plaintiff's Vice President, Arthur D. Shaw, testified as to what his company's representative at the conference told him happened at it. This is probably inadmissible; but, at any rate, from what the parties did thereafter, it seems fairly clear that an agreement must have been arrived at that the articles should be carried as "machine gun parts." So classified, plaintiff would be entitled to collect for the shipments $81,243.53, instead of the first class rate of $96,456.78, which would be applicable if the devices were properly classifiable as anti-aircraft directors.

We say this is fairly evident because of the fact that the Navy representatives made out bills of lading on Government forms, in which they themselves classified the articles to be transported as machine gun parts, and the carrier signed the bills of lading so describing the articles, and it presented vouchers for freight based upon this classification, and these vouchers were paid by the Navy Department. It was not until after the vouchers had been audited by the General Accounting Office that they were questioned and amounts were deducted from the payments made in order to reduce the freight collectible to that applicable to machinery or machines N. O. I. Of course the General Accounting Office was not a party to this conference, and what they did gives no indication of what agreement was made at the conference.

■ Now it is clear that these articles could not properly be described as machine gun parts. A machine gun is a small caliber gun. The guns operated by these gun controls or power drives were 40 mm. guns. This is not a large cannon; in fact, it is nearly the smallest cannon, but it is much more in the nature of a cannon than it is in the nature of a machine gun. It lies between the machine gun and the well known 75 mm. gun. To describe these gun controls or power drives as machine gun parts was by no means accurate. It seems fairly apparent that it was a classification arrived at by an agreement for the purpose of fixing the freight charges, an agreement necessitated by the Navy's desire to keep secret the nature of the device and by the uncertainty of the Navy as to whether or not it was properly classifiable as an anti-aircraft director, and also by the desire on the part of the Navy to secure the carriage of them at the lowest agreeable rate.

When later the defendant insisted upon the carriage of these articles at the rate applicable to machinery or machines, and the plaintiff refused, it filed with the Interstate Commerce Commission a new commodity rate on "Power drive units (electrically controlled)," at second class rates, identical to those applicable to the classification "machine gun parts." This is additional evidence of the fact that plaintiff understood the parties to have agreed at the earlier conference that the articles, whatever their classification, were to be carried at this rate.

As we said above, the fact that the Navy made out bills of lading for the carriage of the articles at this rate, and the fact that the Navy paid vouchers submitted on the basis of this rate, leaves but little doubt in our minds that this was the agreement reached.

We are of the opinion that this case falls under the provisions of section 22 of 49 U.S.C. supra, which permits a carrier to carry property for the Government free, or at rates lower than the tariff rate. We think that in the absence of this agreement, the carrier would have been justified in insisting on the rate applicable to anti-aircraft directors.

Now, it should be said, although we regard this as of secondary significance, that the American Trucking Associations' National Classification Board, which represented trucking companies in the fixing of rates for the carriage of various commodities, inquired of the Commerce Section of the Transportation Division of the Navy Bureau of Supplies and Accounts as to the proper classification of these gun controls or power drives, and that branch of the Navy Department finally concluded on March 17, 1945, that they should be classified as machinery or machines N. O. I. It is also true that about two months later, to wit, on May 23, 1945, the American Trucking Associations' National Classification Board advised plaintiff and the Navy that they were of the opinion that the articles should be classified as directors, anti-aircraft. It also should be said that the Consolidated Classification Committee, which recommended classifications by participating rail, water, and motor carriers, ruled that these gun controls or power drives were properly classifiable as machinery or machines N. O. I. This Committee, however, had no jurisdiction over the carriage of freight by a motor carrier only. For it to have jurisdiction, there must have been either a rail carrier or a water carrier also involved.

When this dispute arose and the Navy insisted upon the carriage of these machines at the rate applicable to machinery or machines N. O. I., plaintiff refused to accept further shipments.

The question is by no means free of difficulty, but we have arrived at the conclusion that there was justification for the claim that these articles were properly classifiable as anti-aircraft directors and, since this is true, it was competent under the Interstate Commerce Act for the parties to enter into an agreement for the carriage of them at a rate lower than that applicable to such a classification, and this is what we think they did.

Looking at the situation as a whole, we think that plaintiff is equitably and legally entitled to the rate applicable to machine gun parts.

Plaintiff has been paid the sum of $81,243.53, of which, up to the time of the hearing, $34,020.36 had been recaptured by the General Accounting Office through withholdings against plaintiff's current accounts. It is entitled to recover the amounts withheld. Judgment will be entered for the sum of $34,020.36.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

**UNITED STATES LINES COMPANY,**

v.

**THE UNITED STATES.**

No. 140–53.

United States Court of Claims.

Oct. 5, 1954.

