Per Curiam:
This case was referred to Trial Commissioner Roald A. Hogenson with, directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on November 17,1965. Exceptions to the commissioner’s report and opinion were filed by the parties and the case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth. Therefore, the court concludes that plaintiff’s cause of action on Government bills of lading AF 6936202 and AF 6936204 accrued more than 6 years prior to the filing of the petition herein and that the court lacks jurisdiction of such claims; that as to the remaining 14 shipments of chaff dispenser tanks, plaintiff is entitled to recover the sum of $25,039.64; that plaintiff is not entitled to recover on its claim involving the two Coraopolis shipments; and that judgment is entered in favor of plaintiff for $25,039.64, and the plaintiff’s petition is otherwise dismissed.
OPINION OF COMMISSIONER*
Hogenson, Commissioner:
This is a suit in which plaintiff, a New Mexico corporation doing business as a motor common carrier in interstate commerce over its authorized routes and jointly with other motor carriers, claims additional freight transportation charges for services rendered to defendant.
All of the pertinent shipments moved in 1957, 1958, and 1959 under Government bills of lading. There were 18 shipments, of which 17 originated at Torrance, California, and 1 at Gallaher, New Mexico.
Of the 17 Torrance shipments, 2 had destinations at Coraopolis, Pennsylvania, 6 at Dayton, Ohio, and 9 at Kelly Air Force Base, Texas. The Gallaher shipment had its destination at Dayton, Ohio.
*1269 The two shipments from Torrance, California, to Cora-opolis, Pennsylvania, covered by Government bills of lading AF 9432812 and AF 9432814, consisted of aluminum wing-tanks for aircraft. These two shipments are hereinafter called the Coraopolis shipments. The only issue is whether the aluminum shell of the aircraft wing tanks was 18 gauge or thicker, as contended by defendant, or thinner than 18 gauge, as contended by plaintiff.
The parties are in agreement that the applicable freight rates on the Coraopolis shipments are provided by Items 88540 and 88620 of National Motor Freight Classification No. A-4, quoted in finding 10, and further that if the shell of the wing tanks was thinner than 18 gauge, plaintiff would be due the sum of $1,122.65; but if such shell was 18 gauge or thicker, plaintiff has been paid hi full.
The Government bills of lading described these tanks as 18 gauge or thicker. Such description is prima facie evidence of the gauge of the tanks shipped. Baltimore & O. R.R. v. United States, 217 F. Supp. 918, 924 (Md. 1963). There is no substantial evidence to the contrary. Plaintiff has failed to sustain its burden of proof, and as to the Coraopolis shipments, plaintiff’s petition should be dismissed.
The other 16 shipments in this case (covered by Government bills of lading numbered AF 6936209, AF 6936212, AF 6936202, AF 6936204, AF 6936205, AF 6936201, AF 6936210, AF 6936211, AF 6936213, AF 6936214, AF 6936215, AF 8909633, AF 6936203, AF 6936208, AF 6936206 and AF 6936201) consisted of articles described by defendant on the pertinent bills of lading as equipment shells for aircraft. Although these articles are admittedly not wing fuel tanks for aircraft, like those involved in the Coraopolis shipments, plaintiff contends that they are in fact tanks and should also be classified for rate purposes as “Tanks, aluminum, SIT, in boxes or crates,” under the same above-mentioned Items 88540 and 88620 of National Motor Freight Classification No. A-4. As to these articles, however, there is no dispute as to their gauge, the parties being in agreement that they are thinner than 18 gauge. Defendant disputes the applicability of the above-mentioned classification, denies that the articles are tanks, and contends that their *1270 correct classification is “Aluminum articles NOI, in boxes or crates” under Item 3290 of National Motor Freight Classification No. 4. Thus the primary issue is whether the so-called equipment shells for aircraft in the 16 shipments were tanks, as there is no dispute that they were aluminum. In the alternative to its above-stated contention, defendant asserts that the rate payable on the articles shipped was that provided in a Section 22 quotation provided by plaintiff and its connecting carriers for the pertinent shipments.
However, as to two of these 16 shipments, i.e., those covered by Government bills of lading AF 6936202 and AF 6936204, defendant correctly contends that this court lacks jurisdiction of the claim because plaintiff’s petition was filed more than 6 years after plaintiff’s right to sue on such shipments accrued. Plaintiff’s petition should be dismissed as to these two shipments. They moved from Torrance, California, respectively, on September 30, and October 81,1957; were delivered to defendant at Kelly Air Force Base, Texas, respectively, on October 8, and November 8, 1957; and in accordance with the billing by the destination carrier, defendant paid the claimed Charges for the transportation services in the respective amounts of $1,332 and $1,402.86 on the respective dates of November 8,1957, and December 6,1957. The General Accounting Office thereafter made no effort to recoup any part of the amounts paid. The petition was filed herein on November 13, 1963, more than 6 years after the delivery of the shipments to defendant. Thus, plaintiff’s claim as to these two shipments is barred by the statute of limitations, 28 U.S.C. §2501 (1958). Baggett Transportation Co. v. United States, 162 Ct. Cl. 570, 578, 319 F. 2d 864, 868 (1963). The statute of limitations is not tolled by the mere fact that plaintiff did not learn of the true identity of the articles shipped until the 1959 statutory post-audit of the other 14 shipments of equipment shells for aircraft. Art Center School v. United States, 136 Ct. Cl. 218, 227, 142 F. Supp. 916, 921 (1956).
The 16 shipments of equipment shells for aircraft (on 14 of which timely suit was commenced by plaintiff) resulted from the performance by Webcor, Inc., of an Air Force contract for the design and manufacture of chaff dispenser *1271 units for aircraft. Tlie bousing or container for each unit was designated in official nomenclature as “GY 1440/ALE-2 Case.” This “case” was the transported item described by defendant on the bills of lading as an equipment shell for aircraft.
Sometime prior to the Webcor contract, this housing or case had been manufactured by Longren Aircraft Corporation for Ryan Industries, with criteria therefor being a 230-gallon airplane wing fuel tank with a skin of 0.040-inch aluminum alloy. The wing tank design was selected for the chaff dispenser case because the aerodynamics of the fuel tank had been proven sound, and because the Chaff dispenser case with its enclosed parts was to be attached to the underside of the wing of an aircraft, in the manner of the fuel tank, and aimed from bomb or fuel-type racks, and would not add excessive weight to the aircraft. Webcor engineers modified the fuel tank design to suit the purpose for which the case was intended under the terms of the Webcor contract, and Webcor subcontracted the manufacture of the case to Longren Aircraft Corporation at Torrance, California.
As manufactured and delivered, the case had the same overall shape or configuration of the airplane wing fuel tank, and without close inspection appeared to be that. However, unlike the fuel tank, the case had three major sections fastened together by removable lock-spring connections; was not leakproof, but had openings and holes, making it unsuitable to hold liquids; was fitted with access doors along the side, affixed to the main body; and had an opening near the tail end, through which the chaff was dispensed by means of an exit tray. The interior construction of the case included aluminum rails, tubes, and a hopper to hold the chaff; and as transported, contained electrical parts and connections, including several relays, terminal boards, cables, and a motor weighing 15 to 18 pounds.
The case as described above was the equipment shell for aircraft involved in the 16 shipments. After arrival at destination, other necessary parts were installed in each case by Webcor to complete the assembly of each chaff dispenser unit. Each case was shipped in a plywood box or crate fully enclosed so that the contents could not be seen,
*1272 None of tbe separate parts in the chaff dispenser unit was classified, but as assembled at destination, the whole unit was; and the contract for its design and manufacture was also classified.
In the latter part of July or early August 1957, plaintiff’s Chicago Terminal Manager became aware of a volume of traffic from Torrance, California, to the destinations involved in the 16 shipments. He was informed of the dimensions of the Shipping boxes, approximate weights, and the approximate total tonnage, but not as to the commodity to be transported.
On the basis of this limited information, plaintiff’s Chicago Terminal Manager prepared and forwarded to defendant’s Military Traffic Management Agency in St. Louis, a Government agency which had jurisdiction over this particular movement, a Section 22 quotation,[1] called Navajo Freight Lines Tender No. 57-24. This quotation was deemed acceptable by Webcor and defendant’s Military Traffic Management Agency. The quotation was duly submitted by plaintiff in its own behalf and for its connecting carriers. All parties concerned intended the quotation to cover the articles moving from Torrance, California, to Dayton, Ohio, and Kelly Air Force Base, Texas, manufactured by Longren under the Webcor contract.
In fact, the Military Traffic Management Agency relied on this quotation; all parties treated it as the basis for estimated freight charges; plaintiff and its connecting carriers billed defendant at the rates quoted therein; and defendant made payments on that basis. Thereafter the General Accounting Office recouped part of the payments made under the Section 22 quotation on the theory that the defendant was entitled to the lesser rate provided under the classification of the commodity as “Aluminum articles NOI, in boxes or crates,” as now contended by defendant.
Although the plaintiff was ignorant of the true identity of the articles shipped, plaintiff and its connecting carriers *1273 deemed that the quoted rates would provide an adequate line-haul revenue to them.
The commodity description in the Section 22 quotation was patently not applicable to the aluminum chaff dispenser cases shipped, being stated as fuel or oil cells, rubber or fabric, with or without wood or metal supports or fittings. At the time the quotation was made, plaintiff’s agent was met with an atmosphere of secrecy surrounding the commodity to be shipped. The Government agents considered and treated the commodity as classified. Throughout the time of the shipments, plaintiff and its connecting carriers were unaware of what was being transported, although they could have found out. The carriers considered their offer of services a fair one under the known circumstances, and were satisfied with the rates they had offered and were paid on the shipments.
The parties are in agreement that on the basis that the proper classification of the chaff dispenser cases is “Tanks, aluminum, SU, in boxes or crates,” plaintiff would be due on the remaining 14 shipments the sum of $112,049.63; that on the basis that the proper classification is “Aluminum articles NOI, in boxes or crates,” plaintiff would be due on the remaining 14 shipments the sum of $2,472.84; and that on the basis of application of the rates contained hi the Section 22 quotation, plaintiff would be due on the remaining 14 shipments the sum of $25,039.64.
The “not otherwise indexed” classification (NOI) is a broad category into which fall those items which the carrier considers either too insignificant to list separately under a general heading (Aluminum articles), or which are unknown or not recalled at the time the tariffs are established for the specific items. Union Pac. R.R. v. United States, 117 Ct. Cl. 757, 764, 93 F. Supp. 617 (1950). In establishing a specific classification, it is obvious that the carrier must consider various factors concerning cost of transportation, such as the shape, size, and weight of the article, the degree of risk of damage in transit involved, and the potential hazard inherent in the item. The chaff dispenser case had no inherent potential danger, but because of its configuration, size, weight, and the thinness of its aluminum shell, *1274 there was indeed substantial risk of damage in transit. It is true that each chaff dispenser case was crated for shipment by the Government contractor, which fact was undoubtedly important to plaintiff in issuing its Section 22 quotation, even though true identity of the article was unknown to plaintiff. Under plaintiff’s classification for aluminum tanks, a note indicates that such tanks could be shipped loose, rather than in boxes or crates, when the shell was not less than 3/16 inch thick. The chaff dispenser case had a thickness of 1/25 inch.
Most of the proof in this case revolves around the issue as to whether or not the chaff dispenser case was or was not an aluminum tank. Plaintiff began by establishing that the original design for the case was that of an aircraft fuel tank, and proceeded to minimize the modifications to the basic design. Plaintiff introduced cogent testimony of tariff experts who considered the chaff dispenser case properly to be classified as an aluminum tank, even though such case was not suited to contain a liquid.
On the other hand, defendant emphasized the modifications to the original fuel tank design, and showed that the case could not possibly contain a liquid. It pointed to the dictionary definition of a tank as a container for liquids.[2] The testimony of the case manufacturer’s agent tended to prove that the manufacturer did not consider the case, placed in commercial transportation by rail in a prior year, a tank for transportation purposes. Moreover, the defendant relies on the bill of lading description of the case as an equipment shell for aircraft as evidence that it was not a tank. ' The defendant stresses the point that the rule of analogy is not applicable in this case, and the pertinent tariff rule so provides. See finding No. 10.
However, the issue in this case is not whether the chaff dispenser case is like or similar to a tank, but whether in fact it is a tank under the pertinent freight classification. If it is not a tank, then defendant is entitled to have the low rate provided by the general classification of “Aluminum articles NOI, in boxes or crates,” even though an intermediate *1275 rate is provided in the Section 22 quotation issued by plaintiff and its connecting carriers, and despite the fact that the Section 22 rate was accepted and applied by defendant’s agents in paying the carrier’s bills on the pertinent shipments. Great Northern Ry. v. United States, 170 Ct. Cl. 188 (1965). But if the aluminum tank rate is basically applicable, then consideration must be given to the applicability of the Section 22 quotation rate, as defendant is entitled to the lowest applicable rate.
Well established case law provides the rule that when a commodity shipped can be classified under either of two tariffs, the tariff classification which is more specific or which more closely fits the commodity shipped will apply. United States v. Gulf Refining Co., 268 U.S. 542, 546 (1925) ; Union Pac. R.R. v. United States, supra; Motor Cargo, Inc. v. United States, 129 Ct. Cl. 493, 495, 124 F. Supp. 370, 371 (1954). This rule is not an application of the rule of analogy, prohibited in the tariff classifications in issue, but rather a rule as to the fair and reasonable construction of tariff language.
Upon consideration of the testimony and evidence of record, it is my conclusion that the chaff dispenser case with the size, shape, configuration, and shell of an aircraft fuel tank is an aluminum tank for the purpose of the freight classifications in issue.
Plaintiff seeks to avoid the application of the Section 22 quotation rate on the grounds that the actual commodity transported was grossly misdescribed in the quotation. It is evident that plaintiff, acting for itself and its connecting carriers, was not concerned about the actual commodity, supposedly classified, contained in the crates or boxes to be transported, but was satisfied with the information supplied concerning dimensions of the Shipping containers and weights involved.
The misdescription in a bill of lading of an article shipped does not control the application of a tariff rate. The tariff rate applicable to the actual item shipped governs. United States v. Francis, 320 F. 2d 191, 196 (9th Cir. 1963). Otherwise, preferential tariff rates would be applied in cases of misdescription of articles shipped, which would violate the *1276 statutory principle of uniformity of rates for all shippers. 49 U.S.C. §2 (1958). The Section 22 quotation, however, is founded upon statutory exemption of Government shipments from such restrictions.
The Section 22 quotation constituted an offer to transport the pertinent shipments at a specified rate, irrespective of the true identity of the commodity involved. It is evident that plaintiff adopted a nominal or fictitious description in its quotation, and had no concern about accuracy of description, holding the belief that whatever was being shipped was classified. Plaintiff’s offer and defendant’s acceptance thereof, as described above, created contract obligations, and no legal basis is established for any enlargement or modification thereof.
Plaintiff is entitled to recover on the 14 remaining shipments of chaff dispenser cases the sum of $25,039.64.
FINDINGS or Fact
1. Plaintiff, a New Mexico corporation, is a motor common carrier in interstate commerce over its authorized routes and jointly with other motor carriers.
2. During the years 1957, 1958, and 1959, plaintiff to the extent that it was the originating earner, and other motor carriers to the extent that they were the destination, carriers, performed freight transportation services for defendant as shown on Schedule A attached to plaintiff’s petition.
3. All shipments moved under Government bills of lading. There were 18 shipments, 17 originating at Torrance, California, and 1 at Gallaher, New Mexico.
Of the 17 Torrance shipments, 2 had destinations at Cora-opolis, Pennsylvania, 6 at Dayton, Ohio, and 9 at Kelly Air Force Base, Texas. The Gallaher shipment had the destination of Dayton, Ohio.
4. The two shipments from Torrance, California, to Cora-opolis, Pennsylvania (identified by Government bills of lading numbered AF 9432872 and AF 9432874) consisted of aluminum whig tanks for aircraft. These two shipments are hereinafter called the Coraopolis shipments. The only unresolved question with respect to these shipments is whether the aluminum material of such articles was 18 gauge *1277 or thicker, as contended by defendant, or thinner than 18 gauge, as contended by plaintiff.
At the time these two shipments moved, the Brown & Sharpe Gauge governed the measurement of the thickness of sheet aluminmn for rating purposes under Rule of National Motor Freight Classification No. A-4.
On these two shipments, plaintiff billed defendant and was paid $5,190.43. On the statutory post-audit, the General Accounting Office determined plaintiff had overcharged the defendant to the extent of $1,722.65, which amount was deducted from a subsequent freight bill of plaintiff, not here hi dispute.
The parties stipulated that if the shell of these tanks was thinner than 18 gauge, plaintiff would be due the sum of $1,722.65; but if 18 gauge or thicker, plaintiff has been paid in full.
5, On the 16 other shipments (covered by Government bills of lading numbered AF 6936209, AF 6936212, AF 6936202, AF 6936204, AF 6936205, AF 6936207, AF 6936210, AF 6936211, AF 6936213, AF 6936214, AF 6936215, AF 8909633, AF 6936203, AF 6936208, AF 6936206 and AF 6936201) the articles shipped were made of sheet aluminum thinner than 18 gauge for rating purposes under plaintiff’s theory. The dispute between the parties is not as to the identity of the article shipped but as to its classification for rate making purposes.
If the articles involved in these 16 shipments are properly classified as “Tanks, alummum, SU, in boxes or crates” (thinner than 18 gauge) under Items 88540 and 88620 of National Motor Freight Classification No. A-4, or supplements and reissues thereof, as contended by plaintiff, plaintiff would be due the total sum of $121,691.53.
If the articles involved in these 16 shipments are properly classified as “Aluminum articles NOI, in boxes or crates” under Item 3290 of National Motor Freight Classification No. A-4, or supplements or reissues thereof, as contended by defendant, plaintiff would be due the total sum of $3,012.84.
If the charges on these 16 shipments are to be computed under Navajo Freight Lines Tender No. 57-24 (hereinafter called the Section 22 quotation), issued August 12, 1957, as *1278 contended by defendant in the alternative, plaintiff would be due the total sum of $28,446.62.
6. The statements of fact contained in finding 5 above on 16 shipments are without prejudice to defendant’s position with respect to the applicability of the 6-year statute of limitations on the two shipments under Government bills of lading numbered AF 6936202 and AF 6936204.
7. On the two shipments covered by Government bills of lading numbered AF 6936202 and AF 6936204, both shipments moved from Torrance, California, to Kelly Air Force Base, Texas.
On Government bill of lading AF 6936202, the shipment was described by defendant therein as “75 boxes, Equipment Shells for Aircraft,” and this shipment moved on September 30, 1957, and was delivered on October 8, 1957. The destination carrier, Curry Motor Freight Lines, Inc., billed defendant and was paid $1,332 on November 8, 1957. On the statutory post-audit completed in 1959, the General Accounting Office made no determination of overcharge.
On Government bill of lading AF 6936204, the shipment was described by defendant thereon as “69 boxes, Equipment Shells for Aircraft,” and this shipment moved on October 31, 1957, and was delivered November 8, 1957. The destination carrier, Strickland Transportation Company, billed defendant and was paid $1,402.86 on December 6, 1957. On the post-audit completed in 1959, the General Accounting Office made no determination of overcharge.
Since the 6-year statute of limitations is applicable on these two shipments, plaintiff is due the sum of $112,049.63 rather than the sum of $121,691.53, and $2,472.84 rather than $3,-012.84, and $25,039.64 rather than $28,446.62, being reductions of the amounts of recovery set forth in finding 5 above.
8. At the pretrial conference in this case, defendant stated that it waived the defense set forth in its answer, filed December 8, 1964, described as Second Affirmative Defense to Part of the Petition.
9. On the two Government bills of lading covering the two Coraopolis shipments (finding 4), each shipment was described by defendant on the bill as “25 CR [Crates] TANKS, *1279 alumiNum, su, is ga [Gauge] OR thicker nmec [National Motor Freight Classification] 88620.”
On the 16 other shipments (hereinafter called the case shipments or shipments of cases), each shipment was described by the defendant on the Government bills of lading as a certain number of boxes of “equipment shells for aircraft.” On two of these shipments of cases, however, changes in the description were made by the defendant as hereinafter related in findings 22 and 23.
10. At the times of the shipments involved in this case, plaintiff’s tariffs, where applicable, provided in pertinent part as follows:
National Motor Freight Classification No. A-4

KULE 14%
(Prior to February 5, 1959)
IRON VS. STEEL, RUBBER, PLASTIC, AND GAUGE OF METAL
_ Sec. 1. Unless otherwise provided, wherever the word “iron” is used, it also includes “steel,” and vice versa.
Sec. 2. Unless otherwise provided, the word “rubber” includes guayule, natural, neoprene or synthetic rubber.
Sec. 3. Unless otherwise provided, where reference is made to the gauge of metal, it means U.S. Standard Gauge.
Sec. 4. Unless otherwise provided, the terms “Plastic” or “Plastics” mean materials consisting of or articles made from synthetic gums or resins, cellulose deriva *1280 tives, casein, solids, coal tar or petroleum resins or rubber hydrochloride, with or without fillers and whether or not reinforced or laminated with fibres or with macerated or sheet paper or fabric.
PULE 14%
(After February 5,1959)
IRON VS. STEEL, RUBBER, PLASTIC, AND GAUGE OF METAL
Sec. 1. Unless otherwise provided, wherever the word “iron” is used, it also includes “steel,” and vice versa.
Sec. 2. Unless otherwise provided, the word “rubber” includes guayule, natural, neoprene or synthetic rubber.
Sec. 3. (a) Unless otherwise provided, where reference is made to gauge, it means U.S. Standard Gauge for sheet or plate steel; Browne & Sharpe Gauge for rods and sheet of aluminum, copper, brass and bronze; and U.S. Steel Wire Gauge for iron or steel wire.
Sec. 3. (b) The following conversion table sets forth the minimum thicknesses in decimals of an inch as related to these gauges:
TABLE OE STANDARD GAUGES

Sec. 3. (c) Where classification ratings are based on gauge and where only thickness is available, the table in paragraph (b) must be used to convert thickness to comparable gauge.
Sec. 4. Unless otherwise provided, the terms “Plastic” or “Plastics” mean materials consisting of or articles made from synthetic gums or resins, cellulose derivatives, casein solid, coal tar or petroleum resins or rubber hydrochloride, with or without fillers and whether or not reinforced or laminated with fibres or with macerated or sheet paper or fabric.
*1281 NATIONAL MOTOR FREIGHT GLASSIFICATION NO. A-4

EULE 14
CLASSIFICATION BY ANALOGY
The rating for any article not provided for, either by its specific name or embraced in an NOI item, shall be the rating provided in this classification or supplements thereto for an article which, in the carrier’s judgment, is most closely analogous. In such cases, facts must be reported to the Chairman of the National Classification Board through the traffic officer of the carrier in order that the establishment of specific provisions may be considered. This rule will not apply in connection with ratings or rates published in exceptions to this classification or in commodity tariffs.
EULE 15
COMBINATION ARTICLES
When not specifically classified, articles which have been combined or attached to each other will be charged at the rating for the highest classed article of the combination, and on shipments subject to volume or truckload rating the minimum weight will be the highest minimum weight provided for such highest rating; where the volume or truckload ratings are the same, the minimum weight will be the highest for any article in the combination.
11. During the pertinent years, Webcor, Inc., had a Government contract for the design and manufacture of chaff dispenser units for aircraft. The housing or container for each unit was designated in official nomenclature as “CY 1440/ ALE-2 Case.” Years before, the housing or case had been manufactured by Longren Aircraft Corporation for Eyan Industries, with criteria therefor being a 280-gallon airplane wing fuel tank with a skin of 0.040-inch aluminum alloy. The 230-gallon fuel tank design was selected because of the type of aircraft to which the case was to be attached and the *1282 load capacity of the aircraft. The aerodynamics of the fuel tank had been proven sound, and the Air Force deemed the same aerodynamics appropriate for the case here in question. Besides having proper shape, the case and its enclosed parts would not add excessive weight to impair operational capacities of the aircraft. However, the case design had to be modified from the fuel tank design to permit its use as the outer part of a chaff dispenser unit. Each chaff dispenser unit was to be attached to the underside of the wing of an aircraft, in the manner of the fuel tank, and aimed from bomb or fuel type racks. Engineers at Webcor modified the fuel tank design to suit the purpose for which the case was intended under the terms of the Webcor contract, and Webcor subcontracted the manufacture of the article to Longren Aircraft Corporation.
12. As manufactured, the case had the shape or configuration of the original wing tank design with an aluminum alloy skin of 0.040 inch. However, the case was not designed or manufactured for the storage of liquids, but rather for the storage of a hopper made of aluminum, which was meant to carry the chaff, and for the storage of electrical connections, including several relays, terminal boards, cables, and a motor weighing approximately 15 to 18 pounds. This case with the above-mentioned parts was the article involved in the 16 shipments of cases, the shipments other than the two Coraopolis shipments. After the arrival at destination of each shipment of cases, other necessary parts were installed by Webcor in each chaff dispenser unit. Each case was shipped in a plywood box or crate, fully enclosed so that the contents could not be seen.
13. In physical appearance, the case had the overall shape of an airplane wing fuel tank, but was composed of three major sections, each fastened together by lock rings which were not permanent but removable connections. The case had openings and drain holes, and in no sense was it suitable for the storage or carrying of liquids. Near the tail end of the case was an opening through which the chaff was dispensed by means of an exit tray. The case was fitted with access doors along the side, affixed to the main body. These access doors were not found in the 230-gallon fuel tank nor *1283 was the opening in the tail end of the case. The interior construction of the case had aluminum rails, side tubes, and a hopper, which were not parts of the 230-gallon fuel tank. The only part of the 230-gallon fuel tank left after its modification to be a case to hold the chaff and internal framework of the chaff dispenser was the overall shape and configuration required in aerodynamic design.
14. Each piece of equipment or part of the chaff dispenser unit was unclassified for security purposes, but the entire unit was classified, and the contract for its design and manufacture was also classified.
15. In the latter part of July or early August 1957, plaintiff’s Chicago Terminal Manager was informed by a commercial traffic service bureau that there would be certain Government requirements for the movement of a volume of traffic from Torrance, California, to various destinations. The information supplied consisted of dimensions of shipping boxes, approximate weights, and the approximate total tonnage.
On the basis of this limited information, plaintiff’s Chicago Manager wrote the Section 22 quotation and forwarded it to the defendant’s Military Traffic Management Agency. The tender cited a rate based on hundred weights and minimum truckloads. The rate was deemed an adequate line-haul revenue to plaintiff and its connecting carriers, and a fair rate for the services to be performed. The tender was duly made by plaintiff in its own behalf and in behalf of its connecting carriers.
16j When the Section 22 quotation was tendered, it was intended by plaintiff’s agent that the rate cited therein would cover the articles to be manufactured by Longren for Web-cor, to be moved by the carriers from Torrance, California, to Dayton, Ohio, or San Antonio, Texas. The Webcor traffic people agreed to this tender, and the Military Traffic Management Agency in St. Louis, a Government agency which had jurisdiction over this particular movement, agreed that the Section 22 quotation met all of their service requirements. In fact, the Military Traffic Management Agency relied on this tender; it was viewed as the basis for estimated freight charges; the plaintiff and its connecting carriers *1284 billed at tile rates cited in the tender; and payment was made On that basis. By its terms, the Section 22 quotation provided that acceptance by the Government would be accomplished by making any shipment or settlement under the terms thereof.
17. The commodity description in the Section 22 quotation was:
Fuel or Oil Cells, rubber or fabric, separate or combined, with or without wood or metal supports or fittings, NOI, in packages.
Fuel or Oil Cells, rubber or fabric, separate or combined, with or without wood or metal supports or fittings, collapsed, in packages.
At the time the tender was made, plaintiff’s agent was met with an atmosphere of secrecy surrounding tJhe commodity that was to be shipped. He did not know that it was made of aluminum. Moreover, the Government’s agents, to whom the information would certainly have been available, considered and treated the commodity as classified. Plaintiff considered its offer of services a fair one under the circumstances, and was satisfied with the rates it had offered and was paid on the shipments.
18. Plaintiff and its connecting carriers had no knowledge of the identity of the article involved in the shipments of cases at any time prior to or during the performance of the transportation services, nor until after the GAO post-audit conducted within 6 years prior to filing of the petition in this case. Plaintiff could have discovered the identity of the article at the commencement of shipments had it desired to do so.
19. Prior to its subcontract with Webeor, Longren Aircraft Corporation had manufactured substantially the same case for Ryan Industries as was involved in the 16 shipments. Under the Ryan subcontract, the cases were shipped by rail under commercial bills of lading, and the shipper described the commodity for Shipping purposes as “Aluminum articles NOI.”
20; The supervisor of the shipping and receiving section of Longren Aircraft Corporation, who acted as the traffic man *1285 ager for the manufacturer and who was in charge of packaging the commodity and preparing it for transportation, did not consider the case a tank since it was not a leakproof container.
•21. The senior member of the National Classification Board of the American Trucking Association considered the case properly classified as an aluminum tank, thinner than 18 gauge, based on his conception of a tank. In his opinion, a tank is a vessel, container, cistern, vat, or similar article, not necessarily a leakproof closed container, but one capable of containing solids rather than liquids. This opinion is shared by the Chairman of the National Classification Board of the American Trucking Association, who was unavailable to testify at the trial, but whose letter in reply to a pertinent inquiry was introduced into evidence by defendant.
The senior member’s opinion was rendered in full appreciation that the above-quoted Bule 14, Classification by Analogy, did not apply in determining the proper classification for the commodity here in question.
22. When the first shipment of these cases arrived at Dayton, Ohio, Mr. Joseph Arnoff, Chief, Procurement Traffic Branch, Wright-Patterson Air Force Base, authorized a change in the Government bill of lading (AF 6936201)’ description from “equipmeNT shells FOR aircraft” to “altjmi-NLím articles NOi” because the technical information at hand showed the commodity to be a chaff dispenser (case) containing certain electrical components, aiid that it was made of aluminum.
23. On the second Government bill of lading arriving at Dayton, Ohio, Mr. Arnoff initially authorized the same change in description, but upon checking with the Military Traffic Management Agency at St. Louis, Mr. Arnoff was informed that Section 22 quotation had been issued to cover the traffic. Mr. Arnoff then had the description changed back to the original “equipmeNT shells for aircraft.” Subsequently, Mr. Arnoff instructed his staff that the original description on the bills of lading was to be retained in’ accordance with standing instructions in the agency. At *1286 this time, Mr. Arnoff had not seen either the commodity itself or the Section 22 quotation.
24. In May or June 1958, at the request of the General Accounting Office, Mr. Arnoff conducted an extensive investigation concerning the item that plaintiff was transporting, and he then formed the opinion that the proper classification of the cases should be “Aluminum articles NOI.” His opinion was based on (1) a physical examination of the article, (2) review of the classified contract, and (3) information furnished by the Government shipping and packaging organization at Dayton, Ohio, and Government procurement technicians and inventory management personnel. He concluded that the article was not a tank because of its internal construction, but conceded that from an observation of the external surfaces of the article, it would appear to be a wing tank.
25. Plaintiff’s Section 22 quotation was issued to the defendant in the ordinary course of business to cover whatever articles were to be manufactured at Torrance, California, and shipped under the Webcor contract, and such tender was accepted by defendant by making the pertinent shipments and payments therefor under such quotation.
26. On the basis of its form and configuration, the degree of risk for damage in transit, and peculiar handling requirements, the commodity transported under the 16 shipments of cases was an aluminum tank.
27. The commodity transported in the Coraopolis shipments was correctly described in the bills of lading issued for their transportation as aluminum tanks, 18 gauge or thicker.
CONCLUSION OF LAW
Upon the foregoing findings of fact and opinion, which are made a part of the judgment herein, the court concludes that plaintiff’s cause of action on Government bills of lading AF 6936202 and AF 6936204 accrued more than 6 years prior to the filing of the petition herein and that the court lacks jurisdiction of such claims; that as to the remaining 14 shipments of chaff dispenser tanks, plaintiff is entitled to recover the sum of $25,039.64; that plaintiff is not en *1287 titled to recover on its claim involving the two Coraopolis shipments; and that judgment is entered in favor of plaintiff for $25,039.64, and the plaintiff’s petition is otherwise dismissed.

 The opinion, findings of fact, and recommended conclusion of law are submitted under tbe order of reference and Rule 57 (a).

 The Interstate Commerce Act provides in section 22 thereof:
§ 22. Restrictions; quotations of rates for united States Government.
(1) Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the united States. * • *. 49 Ü.S.C. § 22 (1958).

 “A large basin, cistern, or other receptacle for liquids * * Webster's New Collegiate Dictionary. (1957).