The **UNITED STATES**

v.

The **ONEIDA NATION OF NEW YORK** et al.

**Appeal No. 13–71.**

United States Court of Claims.

May 11, 1973.

---

11. Count II demands, in the alternative, "such other relief as the court may deem appropriate."

Marvin S. Chapman, Chicago, Ill., attorney of record, for appellees. Dean A. Dickie and Aaron, Aaron, Schimberg & Hess, Chicago, Ill., of counsel.

A. Donald Mileur, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzel, for appellant. M. Edward Bander, Washington, D. C., of counsel.

Before DAVIS, Acting Chief Judge, and SKELTON, NICHOLS, KUNZIG, and BENNETT, Judges.

KUNZIG, Judge:

In issue in this government appeal from a decision [1] of the Indian Claims Commission (the Commission) is whether the government owed and subsequently breached a fiduciary duty to protect the Oneida Indians in land dealings with the State of New York when the United States Government did not participate in the transactions.

We hold that the federal government did owe a fiduciary duty to the Indians when, with knowledge of the transactions, the Government failed to protect the rights of the Indians. We do not hold that actual federal participation is a prerequisite to the imposition of this fiduciary obligation. To determine whether this duty was breached, the case must be remanded to the Indian Claims Commission for factual findings on the question of *scienter* on the part of the federal government.

The Oneida Nation seeks, by this action, additional compensation for land which was ceded to the state pursuant to treaties with the State of New York between 1795 and 1846.[2] These claims are based upon clauses 3 and 5 of the Indian Claims Commission Act, 25 U.S.C. § 70a (1970).[3] Clause 3 is inap-

1. 26 Ind.Cl.Comm. 138 (1971).

2. Although the initial petition names twenty-seven (27) treaties, two of these, the Treaty of June 28, 1785 and the Treaty of September 22, 1788, are the subject of separate claims since they occurred prior to the enactment in 1790 of the first Trade and Intercourse Act (1 Stat. 137), thus reducing the number of treaties in issue to twenty-five (25).

3. The Indian Claims Commission Act, 25 U.S.C. § 70a (1970), reads in pertinent part:
"The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group

of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cogniza-

plicable here because it is expressly limited to transactions between the Indians and the United States Government. The federal government, however, might be liable under clause 5 (fair and honorable dealings) if a "special relationship" is established between the government and the claimant Indians affecting the controverted subject matter. Lipan Apache Tribe v. United States, 180 Ct.Cl. 487, 502 (1967). The Indians' contention is that the "special relationship" was established by the Trade and Intercourse Act of 1790 which imposed a fiduciary duty upon the federal government regarding Indian land transactions. Accordingly, the Indians now seek recovery under the Indian Claims Commission Act.

The Indian Claims Commission found for the Indians in all twenty-five (25) treaties. We have no difficulty affirming that decision as to the lands ceded pursuant to the Treaty of June 1, 1798 and the Treaty of June 4, 1802, because there were federal government representatives clearly in attendance at these treaty signings.[4] We are faced with greater difficulty with the remaining twenty-three (23) treaties because there was no evidence at trial on the issue of knowledge by the federal government of the transactions transpiring pursuant to these treaties. The Government urges upon this court the position that although the knowledge or notice issue is important, it is unnecessary to reach the issue in this case because there is no "special relationship" or fiduciary duty imposed upon the United States by the

Trade and Intercourse Acts arising from sales of New York land to the State of New York by resident Indians. This position we find untenable.

Since the Government seemingly concedes that the Oneidas are entitled to prosecute their claims before the Indian Claims Commission pursuant to 25 U.S. C. § 70a (1970), the sole issue is whether and to what extent a fiduciary relationship exists between the Oneida Nation and the United States pursuant to the Trade and Intercourse Acts.

Between 1785 and 1846 the Oneida Nation and the State of New York were signatories to twenty-seven (27) treaties in which the Indians ceded a vast majority of their land to the state. The Oneida Nation, as found by the Commission, was a tribal member of the Iroquoian Confederacy located along the shores of Oneida Lake in west-central New York. On June 28, 1785, the Oneida Nation joined with the Tuscarora Tribe to cede certain lands located in New York to the State of New York. Thereafter, by the terms of the Treaty of 1788, the Indians ceded all of their lands to the State of New York, except for an area of approximately 100 square miles that was reserved for their own use and was to be held by them and their posterity forever (hereinafter referred to as the Oneida Reservation). Between 1795 and 1846, the State of New York entered into a series of twenty-five (25) treaties with the Oneidas whereby the State of New York acquired virtually the entire Oneida Reservation.

ble by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. No claim accruing after August 13, 1946, shall be considered by the Commission."

4. The Treaty of June 1, 1798 stated in part:

PRESENT, Joseph Hopkinson Commissioner appointed under the authority of the United States to hold the Treaty [and] Egbert Benson, Ezra L'Hommedieu and John Taylor Agents for the State of New York. . . .

The Treaty of June 4, 1802 stated in part:

"PRESENT, John Taylor Agent appointed under the authority of the United States to hold the Treaty, and Ezra L'Hommedieu and Simon Dewitt Agents for the State of New York. . . ."

## I

### Fiduciary Duty

■ There can be no doubt that a fiduciary relationship does exist between the Indians and the United States Government. This was first established by the Trade and Intercourse Act of 1790 which required governmental consent prior to any sale or conveyance of Indian lands.[5] Although there have been revisions of this Act throughout the years, the basic requirement of federal consent in any disposition of Indian lands remains unchanged.[6] Shortly after the enactment of the first Trade and Intercourse Act, President Washington, in a speech to a tribe of New York Indians, clearly defined the intended relationship between the federal government and the Indians:

> No State, no person, can purchase your lands, unless at some public treaty, held under the authority of the United States. *The General Government will never consent to your being defrauded, but it will protect you in all your just rights. . . .* But your great object seems to be, the security of your remaining lands; and I

have, therefore, upon this point, meant to be sufficiently strong and clear, that, in future, you cannot be defrauded of your lands; that you possess the right to sell and the right of refusing to sell, your lands; that, therefore, the sale of your lands, in future, will depend entirely upon yourselves. But that, when you may find it for your interest to sell any part of your lands, the United States must be present, by their agent, *and will be your security that you shall not be defrauded in the bargain you may make. . . .* That, besides the before mentioned security for your land, you will perceive, *by the law of Congress for regulating trade and intercourse with the Indian tribes, the fatherly care the United States intend to take of the Indians.* (Emphasis added.)

American State Papers (Indian Affairs, Vol. I, 1832), p. 142.

Judicial interpretation of the relationship between the Indians and the federal government has been consistent with President Washington's statement. The Supreme Court has stated that the purpose of the Trade and Intercourse Act

---

5. The Trade and Intercourse Act of 1790 reads in pertinent part:
"... no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, *or to any state,* whether having the right of pre-emption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States." 1 Stat. 137, 138 (emphasis added).

6. By the Act of March 1, 1793, Sec. 8, 1 Stat. 329, 330, the 1790 Act was amended to read as follows:
"That no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution; and it shall be a misdemeanor, in any person not employed under the authority of the United States, in negociating [sic] such treaty or con-

vention, punishable by fine not exceeding one thousand dollars, and imprisonment not exceeding twelve months, directly or indirectly to treat with any such Indians, nation or tribe of Indians, for the title or purchase of any lands by them held, or claimed: *Provided nevertheless,* That it shall be lawful for the agent or agents of any state, who may be present at any treaty, held with Indians under the authority of the United States, in the presence, and with the approbation of the commissioner or commissioners of the United States, appointed to hold the same, to propose to, and adjust with the Indians, the compensation to be made for their claims to lands within such state, which shall be extinguished by the treaty."
This version was carried forward, with slight changes, into the Act of May 19, 1796, Sec. 12, 1 Stat. 469, 472; the Act of March 3, 1799, Sec. 12, 1 Stat. 743, 746; the Act of March 30, 1802, Sec. 12, 2 Stat. 139, 143; the Act of June 30, 1834, Sec. 12, 4 Stat. 729, 730; and R.S. § 2116, now 25 U.S.C. § 177.

was to avoid improper and unfair disposition of Indian lands and to allow the federal government to act as *parens patriae* to effectuate this purpose. F.P.C. v. Tuscarora Indian Nation, 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). The Court of Claims has similarly not been shy in holding that the relationship is more than that of a nonparticipating bystander, or of a sovereign toward its ordinary citizens. It is a special relationship necessitating a special responsibility. Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct.Cl. 487, 493, cert. denied, 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964). In Seneca Nation of Indians v. United States, 173 Ct.Cl. 917 (1965) (hereinafter referred to as the second *Seneca* case [7]) this court went further and stated that:

> [t]his responsibility [*i. e.* that imposed by the Trade and Intercourse Act] was not merely to be present at the negotiations or to prevent actual fraud, deception, or duress alone; *improvidence, unfairness, the receipt of an unconscionable consideration would likewise be of federal concern.* (Emphasis added.)

*Id.* at 925.

Therefore we re-affirm previous decisions that held that the Trade and Intercourse Act establishes a fiduciary relationship between the Indians and the United States Government.

## II
### *Applicability of Fiduciary Duty to State Transactions*

Despite the foregoing, the Government contends that this fiduciary relationship does not extend to transactions between resident Indians and the State of New York. It is urged that the second *Seneca* case is distinguishable from the instant case because there, the land transactions did not involve a state, but, rather, were between the Indians and private parties. Accordingly, the appellant argues that the special relationship described in the second *Seneca* case is limited to dealings between Indians and private parties. We cannot adopt such a narrow reading of the statutory and judicial basis of the fiduciary relationship described by Judge Davis.

Sales to states were expressly prohibited in the original Trade and Intercourse Act itself.[8] Although this language referring to the states was dropped in subsequent Trade and Intercourse Acts, it was replaced by language which forbids *any* and *all* purchases from the Indians absent federal governmental consent regardless of the parties. Judicial interpretation reinforces this position. Mr. Justice Whittaker in F.P.C. v. Tuscarora Indian Nation, *supra,* clearly did not limit the Trade and Intercourse Act to dealings between Indians and private parties. He only excluded dealings with the United States Government itself.[9]

Although Judge Davis did not deem it necessary to reach this issue of the applicability of the Trade and Intercourse Act to transfers to the State of New York in either of the *Seneca* cases (Seneca Nation of Indians v. United States, 173 Ct.Cl. 912, 915 (1965) and Seneca Nation of Indians v. United States, 173 Ct.Cl. 917 (1965)), his pithy opinions do not preclude a decision favorable to the Indians in this case.[10] There is no com-

---

7. There are two *Seneca* opinions reported in Vol. 173. The above cited case is the second opinion of the two in the book and is thus known as the "second *Seneca*" case.

8. *Supra* note 5.

9. "The obvious purpose of that statute [Trade and Intercourse Act] is to prevent unfair, improvident or improper disposition by Indians of lands owned or pos-

sessed by them to other parties, except the United States, without the consent of Congress . . ." 362 U.S. 99, 119, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960).

10. In both of the *Seneca* cases, Judge Davis refers to the *Tuscarora* litigation in which two Circuit Courts of Appeals held the Trade and Intercourse Act applicable to condemnations by the state. Tuscarora Nation of Indians v. Power

pelling reason to draw a distinction between dealings by the Indians with private parties and dealings with the State of New York. President Washington drew no such distinction. The United States Government assumed a responsibility to protect the Indians in *all* their land transactions. There is no convincing evidence that Congress intended to draw a distinction between private individuals and state governments when they purchased land from Indians. The duty was owed to the Indians regardless of the other party to the transaction. The only logical exception is the one drawn by Mr. Justice Whittaker in F.P. C. v. Tuscarora Indian Nation, *supra*—the United States Government itself.

We accordingly hold that the Trade and Intercourse Act is applicable to transfers between the Oneida Nation and the State of New York. This conclusion, however, does not automatically lead to complete affirmance of the Indian Claims Commission decision in this case.

## III

### Scienter

■■■ The Government's alternative argument in this case is that it cannot be held to a fiduciary duty for transactions in which it did not participate. The evidence is clear that government representatives were present at only two of the twenty-five (25) treaties in issue in this case.[11] The Government would argue that the absence of participation in the remaining twenty-three (23) treaties releases it from any fiduciary duty that might have existed. Although the Government did not actually participate in the remaining treaties, we hold the fiduciary relationship would continue to exist if the Government had either actual or constructive knowledge of the treaties.[12] With such knowledge, if the Government subsequently failed to protect the rights of the Indians, then there would be a breach of the fiduciary relationship. This court does not see any distinction between *participation* and failure to exercise a duty, and *knowledge* and the failure to exercise the same duty.[13]

At oral argument, attorneys for both parties conceded that the issue of the Government's knowledge of the transactions between the State of New York and the Oneida Nation was not pursued before the Indian Claims Commission. There is reason to believe that the Government might have known or had reason to know of the New York treaties and did not object to them.[14] Should such be the case, then there would have been a breach of the fiduciary duty as to the twenty-three (23) remaining treaties as there was to the two treaties in which the government agents were in attendance. Since this is a factual question and since we are an appellate court in cases of this nature (Suquamish Tribe of Indians v. United States, 197 Ct.Cl. 775 (1972)), we are compelled to remand this case to the Indian Claims Commission for a determination on the limited issue of the Government's knowledge (ac-

Authority, 257 F.2d 885 (2nd Cir. 1958), cert. denied, 358 U.S. 841, 79 S.Ct. 66, 3 L.Ed.2d 76, appeal dismissed, 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960) ; Tuscarora Indian Nation v. Federal Power Comm'n, 105 U.S.App.D.C. 146, 265 F.2d 338, 339 (1958), rev'd on other grounds, 362 U.S. 99, 80 S.Ct. 543, 4 L. Ed.2d 584 (1960).

11. *Supra*, note 4.

12. It was not necessary for the court to reach this point in either of the *Seneca* decisions. In the first, 173 Ct.Cl. 912 (1965), the decision rested on "narrower footings" ; in the second, 173 Ct.Cl. 917 (1965), there was actual government participation.

13. The mere presence of a government agent at a treaty signing might have, in fact, conveyed less knowledge to the Government about the transactions than knowledge acquired by other means.

14. Gunther, Governmental Power and New York Indian Lands—A Reassessment of a Persistent Problem of Federal-State Relations, 8 Buffalo L.Rev. 1, 6 (1958).

tual or constructive) of the New York treaties.[15]

Accordingly, we affirm the decision of the Indian Claims Commission as it refers to the Treaties of June 1, 1798 and June 4, 1802 and remand the remainder of the case to the Commission to decide the issue of whether the federal government actually knew or can be held to have known of the remaining twenty-three (23) treaties between the Oneida Nation and the State of New York.[16]

Affirmed in part; remanded in part.

SKELTON, Judge (concurring in part and dissenting in part):

I agree with that part of the court's opinion that affirms the decision of the ICC with reference to the Treaties of June 1, 1798, and June 4, 1802, because representatives of the government were present at the signing of those treaties and the government is deemed to have knowledge of them.

I reluctantly agree to the remand of the remainder of the case to the ICC to determine whether or not the government had any actual knowledge of the remaining 23 treaties at or about the time they were signed, as this was not developed at the trial. The burden was on the plaintiffs to offer proof of this kind and they failed to do so. It is doubtful if they should be given a second chance to introduce evidence of this kind which necessarily will be of ancient vintage if it exists at all. However, I do not agree with that part of footnote 16 that implies that the government "should have known" of the treaties by the possible existence of any of the slight circumstances mentioned in the footnote. I refer particularly to the fact that the government assisted in moving ("removing" as the footnote expresses it) some of the Indians from New York to Wisconsin. This could have been an act of kindness on the part of the government. The Indians could have had many perfectly valid reasons for wanting to go to Wisconsin that were in no way connected with a sale of their land. I do not think that the ICC should be led to believe that this court is of the opinion that the mere assistance of the government in helping the Indians move is sufficient to charge the government with knowledge of the treaties.

Furthermore, in my opinion, a finding that the government "should have known" of the treaties, is not enough to impose liability on the government in the absence of "actual knowledge" on its part. This would actually be a conclusion of law. Knowledge is based on findings of fact, which should be left to the ICC as the fact finding body. I do not think we should tell the Commission what facts to find.

BENNETT, Judge, joins in the foregoing opinion concurring in part and dissenting in part.

---

15. It should be noted that the Indian Claims Commission has yet to determine the issue of conscionability with regard to all of the treaties in this case.

16. It is not difficult to contemplate possible items which could be construed as imposing constructive knowledge upon the Government. For example: the possibilities that the treaties were registered with some government agency; that there was pertinent correspondence relating to the treaties; that the treaties were reflected in federal land maps; that the treaties altered the state land tax structures which might have been reflected in federal government statistics; that the seat of the Government being in New York itself imposed knowledge; and other similar items. Finally, it was also suggested at oral argument that the United States Government actually assisted in the subsequent removal of these Indians to the State of Wisconsin. If this be the case, then it could be assumed that someone in the federal bureaucracy knew why the Indians were moving, i. e. the sale of their lands to the State of New York.