**CUMBERLAND MINERAL COMPA-
NY, a Kentucky Corporation**

v.

**The UNITED STATES.**

No. 114–73.

United States Court of Claims.

April 16, 1975.

---

* The dissenting opinion of Judge Nichols fol-
lows the opinion of the trial judge which has
been adopted by the court.

David E. Rodgers, Knoxville, Tenn.,
attorney of record, and James S. Tipton,
Jr., for plaintiff; Kramer, Johnson, Ray-
son, Greenwood & McVeigh, Knoxville,
Tenn., of counsel.

Gerald S. Fish, Washington, D. C.,
with whom was Asst. Atty. Gen. Wallace
H. Johnson, for defendant.

Before NICHOLS, KUNZIG and BEN-
NETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on
plaintiff's exceptions to the recom-
mended decision filed by Senior Trial
Judge Mastin G. White on September 13,
1974, pursuant to Rule 134(h), having
been submitted to the court on oral ar-
gument and the briefs of counsel. Upon
consideration thereof, since the court
agrees with the said recommended deci-
sion,* as hereinafter set forth, it hereby
affirms and adopts the same as the basis
for its judgment in this case. It is
therefore concluded that plaintiff is not
entitled to recover and the petition is
dismissed.

### OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge:

This is a "taking" case brought by the
plaintiff under the portion of the fifth
amendment to the Constitution which
declares, "nor shall private property be
taken for public use, without just com-
pensation." The plaintiff sues for $551,-
874.77,[1] allegedly representing the value
of clay and sandstone which the defend-
ant admittedly took from certain land in
Kentucky and used in the construction of
the Laurel River Dam.

Both the plaintiff and the defendant
claim ownership of the clay and sand-
stone in question, and the court is called
upon to adjudicate these conflicting
claims.

---

1. The claim, as originally asserted in the peti-
tion, was for $500,000.

In the 1930's, the defendant was engaged in a large-scale program for the acquisition of lands to be used for national forest purposes. During the course of this program, the defendant purchased from The Castle Craig Coal Company, a Kentucky corporation, 26,158 acres of land located in Laurel, Whitley, and Pulaski Counties, Kentucky. The deed of conveyance was dated October 14, 1935. (For the sake of convenience, this land will usually be referred to hereafter in the opinion as "the Castle Craig land.")

Ever since its acquisition by the defendant, the Castle Craig land has been administered by the Forest Service of the U.S. Department of Agriculture as part of the national forest system. The land was initially incorporated in the Cumberland National Forest, but in 1966 this forest was redesignated as the Daniel Boone National Forest.

The deed conveying the Castle Craig land to the defendant contained the following provision (among others):

> RESERVING, however, from the operation of this conveyance, unto the party of the first part [The Castle Craig Coal Company], its successors, grantees and assigns, the mineral, oil, and gas, in, upon and under the above described tracts of land, in perpetuity * * *.

By means of deeds dated December 10, 1935, and December 14, 1937, The Castle Craig Coal Company conveyed to the plaintiff, Cumberland Mineral Company, a Kentucky corporation, the mineral, oil, and gas which The Castle Craig Coal Company had reserved in conveying the Castle Craig land to the defendant on October 14, 1935. The plaintiff is still the owner of such interests.

Many years after acquiring the Castle Craig land, the defendant (acting through the Corps of Engineers, Department of the Army) constructed the Laurel River Dam on a portion of such land. This dam was an earth-filled dam, and two types of material were needed in its construction, i. e., an impervious material for the core of the dam and a covering material to give the dam stability. A clay deposit, known as Borrow Area C and located about a mile from the dam site (in a straight line), was selected as the source of the impervious material. Sandstone cliffs located on opposite sides of the Laurel River in the vicinity of the dam site, and known as Quarry Areas 2 and 3, were selected as the sources of the covering material.

Approximately 516,362 cubic yards of clay were removed from Borrow Area C by the Corps of Engineers and used as the impervious core of the Laurel River Dam. Approximately 2,228,000 cubic yards of sandstone were removed from Quarry Areas 2 and 3 and used as the covering material in the form of riprap. These activities occurred in 1970 and 1971.

The dam site, Borrow Area C, and Quarry Areas 2 and 3 were all located on the ·Castle Craig land. Thus, the clay and sandstone previously mentioned as having been removed and used in the construction of the Laurel River Dam were taken by the Corps of Engineers from the Castle Craig land.

When the plaintiff learned that the Corps of Engineers was using clay and sandstone from the Castle Craig land in the construction of the Laurel River Dam, the plaintiff approached the Corps of Engineers and requested compensation for the clay and sandstone in question. However, the Corps of Engineers refused to compensate the plaintiff for the clay and sandstone, on the asserted ground that such materials were the property of the Government and not the property of the plaintiff. The present litigation followed.

The primary question to be decided by the court is whether the clay and sandstone which the defendant removed from the Castle Craig land and used in the construction of the Laurel River Dam were covered by, or outside the scope of, the reservation of "the mineral, oil, and gas, in, upon and under" the Castle Craig land, as contained in the deed of October 14, 1935, conveying such land to the defendant.

Neither clay nor sandstone is a mineral, if the term "mineral" is to be considered only from the scientific standpoint. A mineral, in the scientific sense of that term, is a chemical element or compound occurring naturally as a product of inorganic processes. Any mixture is outside the mineral category, in the true sense of the term "mineral."

Rocks are mixtures and, therefore, are outside the mineral category. Sandstone is a sedimentary rock. Shale and limestone are two other types of sedimentary rock. Clay is a soil deposit that it derived from the decomposition of rock, principally shale. Accordingly, neither sandstone (a rock) nor clay (a derivative of rock) is a mineral, in the scientific sense of the term "mineral."

The courts, however, in construing mineral reservations and conveyances in connection with realty transactions, have sometimes determined that, under the circumstances of particular cases, the word "mineral" was used in a sense broader than the scientific one, so as to include material outside the scientific meaning of the term "mineral." For example, it was held in one case that limestone, a rock, was included in a conveyance of "All minerals, coal, clays, spars, oil-gases and every other kind and character of *mineral cement*, oil, gases * * in on and under" certain land (emphasis supplied), since portland cement is generally manufactured from limestone. Rudd v. Hayden, 265 Ky. 495, 97 S.W.2d 35 (1936). On the other hand, it has been held in other cases that limestone was not included within the scope of a reservation of "all the metals and minerals of every kind and character whatsoever in and underlying the entire body of" certain land (Beury v. Shelton, 151 Va. 28, 144 S.E. 629 (1928)), or within a reservation of 1/16 of the oil and gas, 1/2 of the fireclay, and "a 1/2 interest in all other minerals on" certain land (Little v. Carter, 408 S.W.2d 207 (Ky.1966)).

It has been held that shale, a rock, was included within a conveyance of "all the coal, ores, and other minerals and metals in under, and upon" certain land (McCombs v. Stephenson, 154 Ala. 109, 44 So. 867 (1907)). On the other hand, it has been held that clay, a soil deposit derived mainly from the decomposition of shale—and one of the materials involved in the present litigation—was not included within a conveyance of a one-half interest in "all of the oil, gas and other minerals in and under" certain land (Hans v. Great Bend Brick & Tile Co., 172 Kan. 478, 241 P.2d 475 (1952)), or within a conveyance of "all the coal and other minerals of every kind and description, except gas and oil in and underlying" certain land (Rock House Fork Land Co. v. Raleigh Brick & Tile Co., 83 W.Va. 20, 97 S.E. 684 (1918)).

As for sandstone, the other material involved in the present case, it was held in Kalberer v. Grassham, 282 Ky. 430, 138 S.W.2d 940 (1940), that a sandstone quarry was included within a conveyance of "all the minerals of every kind and character, except the coal and natural gas and coal oil," in a certain tract of land. On the other hand, it was held in United States v. Sparkman (E.D.Ky. 1962; Civil Action No. 1012; unreported) that where the Government acquired a tract of land for national forest purposes but subject to a reservation of "the mineral, gas and oil rights for a period of twenty-five (25) years," the reservation did not include "sandstone * * * which lies so close to the surface * * that the removal of same will necessarily destroy the surface overlying such deposits."

The decisional diversities previously cited will illustrate why the Supreme Court said in Northern Pacific Railway Co. v. Soderberg, 188 U.S. 526, 530, 23 S.Ct. 365, 47 L.Ed. 575 (1903), that "The word 'mineral' is used in so many senses, dependent upon the context, that the ordinary definitions of the dictionary throw but little light upon its signification in a given case." Therefore, in construing mineral reservations and conveyances, "each determination must be made in the light of the language of the particular instrument together with the circumstances and conditions existing at the time." Dierks Lumber & Coal Co. v.

Meyer, 85 F.Supp. 157, 162 (W.D.Ark. 1949).

When the meaning of the world "mineral," as used in the reservation of "the mineral, oil, and gas, in, upon and under" the Castle Craig land, is considered in the light of the circumstances surrounding the acquisition of that land by the Government from the Castle Craig Coal Company, it is apparent that the parties to the transaction of October 14, 1935, could not reasonably have understood that The Castle Craig Coal Company was reserving to itself the sandstone and clay in such land.

One of the significant circumstances to be considered is that the Castle Craig land was purchased by the Government as part of a large-scale program for the acquisition of land to be used for national forest purposes, i. e., for the growing of trees. Another significant circumstance is that the geological formations in the Kentucky region containing the Castle Craig land are composed principally of sandstone strata, to the extent of approximately 75 percent, the remainder being mainly strata of shale and its derivative, clay.

It is obvious from the facts outlined in the preceding paragraph that if the plaintiff, as successor in interest to The Castle Craig Coal Company, were the owner of the sandstone and clay in the Castle Craig land and were to exercise its right of ownership by removing all of these materials, about the only thing that would be left for the Government would be a vast chasm, thus wholly defeating the purpose of the October 14, 1935, transaction whereby the ownership of the Castle Craig land was transferred from The Castle Craig Coal Company to the Government in order that such land could be used by the purchaser for the growing of trees. Such a situation could not reasonably have been within the contemplation of the parties.

It must be concluded, therefore, that the reservation of "the mineral" in the Castle Craig land, as set out in the deed of October 14, 1935, was not intended to cover, and did not cover, the sandstone and clay in such land.

In this connection, it is at least worthy of mention that during the period of approximately 35 years which intervened between the time when the plaintiff acquired the mineral oil and gas in the Castle Craig land and the time when the defendant began to remove sandstone and clay from such land and to use these materials in the construction of the Laurel River Dam, the plaintiff did not make any attempt to extract or dispose of sandstone or clay from the Castle Craig land. The only sort of development in the Castle Craig land attempted by the plaintiff under the reservation of "the mineral, oil, and gas" was the drilling of several wells for oil, only one of which produced oil in commercial quantities.

It has previously been indicated that the only cited cases which specifically involved the question of whether clay was covered by a mineral reservation or conveyance gave negative answers to this question. However, it is necessary that special consideration be given to the case of Kalberer v. Grassham, 282 Ky. 430, 138 S.W.2d 940 (1940), which held that a sandstone quarry was within the scope of a mineral conveyance.

In Kalberer v. Grassham, a man and his wife conveyed to a mineral company "all the minerals of every kind and character, except the coal and natural gas and coal oil, including the right of way to open said minerals in" a certain tract of land, with the grantors retaining "as their own, all the surface of the said land, and all the coal or natural coal oil in or under said land." A sandstone quarry was located on the land.

Subsequently, a controversy arose between Kalberer, as successor in interest to the grantors, and Grassham, as successor in interest to the grantee, over the question of whether the mineral conveyance included the sandstone quarry on the land.

The Court of Appeals of Kentucky said (138 S.W.2d at 943) that "the word

'mineral' as commonly used in mineral deeds, may or may not include rock of any character—depending upon the language used in the grant and the surrounding circumstances of the parties"; and that the mineral deed which the court was construing "expressly excepted coal, natural gas and coal oil, the character or type of minerals more likely to be found and more commonly known to exist in that community, and if the reservation be extended by implication to rock quarries and other like substances, then practically everything would be reserved and nothing granted." The court also emphasized the fact—which the court inferred from the surrounding circumstances—that the grantor was aware that the grantee was engaged in the business of producing stone (among other things). In the light of the surrounding circumstances, the court concluded that the stone quarry was included in the mineral conveyance.

Kalberer v. Grassham, *supra*, is readily distinguishable on the facts from the present case. There, a company engaged in the business of producing stone (among other things) purchased "all the minerals"—except for any coal, natural gas, or coal oil—in a certain tract of land, with the seller retaining "all the surface of the said land, and all the coal or natural gas or coal oil in or under said land"; and the court concluded that the parties reasonably intended that the purchaser should receive—and the seller should not retain—a sandstone quarry located on the land. Obviously, the sandstone quarry was more properly within the scope of the grant of "all the minerals" than it was within the scope of the retention of "all the surface" of the land involved in Kalberer v. Grassham.

In our case, the Government purchased all rights of ownership in the surface and subsurface of the Castle Craig land so that such land could be used for the growing of trees, except that the seller reserved "the mineral, oil, and gas, in, upon and under" the land. If the reservation involved here were to be construed as including the sandstone and clay formations in the subsurface of the Castle Craig land (comprising more than 75 percent of the subsurface formations), "then practically everything would be reserved and nothing granted" (Kalberer v. Grassham, *supra*, 138 S.W.2d at 943). Such a construction of the reservation would be unreasonable and, as previously stated, wholly defeat the purpose of the transaction whereby the Government acquired the Castle Craig land for national forest purposes. Under these circumstances, the subsurface formations essential to support the forest were more properly within the scope of the grant of the land than they were within the scope of the reservation of "the mineral" in the land.

For the reasons previously stated, it is my opinion that the reservation of "the mineral" in the Castle Craig land, as set out in the deed of October 14, 1935, did not include the sandstone and clay in the Castle Craig land; and that the sandstone and clay which the defendant removed from the Castle Craig land and used in the construction of the Laurel River Dam were the property of the defendant and not the property of the plaintiff, as successor in interest to The Castle Craig Coal Company.

The conclusion stated in the preceding paragraph makes it unnecessary to consider other questions to which the parties have devoted considerable attention in their briefs. One of these is the question of the proper measure of damages where the Government has taken mineral deposits belonging to a private person. Another is the question of the effect of the filing in 1973 by the Government of a suit in the United States District Court for the Eastern District of Kentucky to acquire through condemnation the reserved mineral, oil, and gas in the portion of the Castle Craig land where the Laurel River Dam and its upstream reservoir are located. Quarry Areas 2 and 3, from which sandstone was removed by the defendant for use in the construction of the Laurel River Dam, are within the 2,490.7-acre parcel involved in the con-

demnation suit. However, the removal of sandstone from Quarry Areas 2 and 3 had been completed, and the use of such material in the construction of the Laurel River Dam had ceased, prior to the filing of the condemnation suit.

As the sandstone and clay which the defendant removed from the Castle Craig land and used in the construction of the Laurel River Dam were not reserved minerals subject to the plaintiff's ownership, the plaintiff is not entitled to recover in the present case. Accordingly, the petition should be dismissed.

NICHOLS, Judge (dissenting):

My first or threshold objection to the trial judge's able opinion is that he fails to state what law governs the interpretation of the deed involved, which relates to Kentucky land. Plaintiff urges it is definitely the case law of Kentucky, and I think it is right. United States v. Certain Property, Etc., 344 F.2d 142 (2d Cir. 1965). We have recently refused to apply Massachusetts law to a lease to the Federal government of Massachusetts property, indicating, however, that this turns on a lease being more like a contract than like a deed. Keydata Corp. v. United States, 504 F.2d 1115, 205 Ct.Cl. 467 (1974). The trial judge straddles the problem but pays special attention to Kentucky cases.

Perhaps it is true that most cases considered, in Kentucky courts and others, actually turn on context indications of what the parties were thinking about, the term "mineral" itself having no fixed meaning at law. According to Webster's Unabridged (1968 ed.) the term definitely does include building stone and clay, as well as gravel and sand. In the circumstances, it appears to me the proper canon of interpretation is that the common meaning is presumptively the legal meaning, in Kentucky and elsewhere, unless a contrary intent appears. Webster's is a good source for common speech, which the trial judge has ignored.

The trial judge quotes from Northern Pacific Ry. Co. v. Soderberg, 188 U.S. 526, 530, 23 S.Ct. 365, 47 L.Ed. 575 (1903), but the decision taken as a whole tends against his decision here. It involved a clause in a Government land grant to the railroad, excluding "all mineral lands." The issue was whether this excluded a quarter section chiefly valuable for a ledge of granite suitable to be quarried. In construing such a grant, obviously full adherence to the dictionary meaning of "mineral" would be impossible as excluding all lands. Nevertheless the Court calls attention to that meaning, and to some English decisions equally broad. It derives light from other sources as to Congressional intent, too varied to be summarized here. It comes down solid against the railroad: thus granite lands, at least, are "mineral lands". This would be a fortiori for any exclusion, not of entire quarter sections, but just of the mineral itself, where a broad construction would not frustrate the grant entirely.

I am willing to go down the trial judge's road, analyzing the surrounding circumstances to ascertain the intent of the parties, and it leads me to a different result.

Defendant by the involved deed acquired 26,158 acres for a national forest. The grantor was a coal company. It agreed to exercise its reserved right in accord with rules and regulations prescribed by the Department of Agriculture, and these required it to pay for all trees it might remove.

Sandstone and clay are not normally articles of commerce and are normally extracted from the ground only when, as here, they are wanted for local construction purposes. The feeling seems to be that the intent was only to reserve minerals of commercial importance, such as coal, the grantor's business concern, or petroleum. That seems to me a fleeting and uncertain test. Suppose there were uranium in the rock. Was it excluded because it had no commercial value on the date of the grant, or included because it has commercial value on the date of the court's judgment?

It appears to me from the findings a reasonable inference that the Government wished to pay the lowest price and in order to do so, decided to take a chance on future mineral exploitation in the area. The possibility would have appeared very slim that extraction for either commercial or local construction purposes would seriously interfere with the intended use over any substantial portion of the tract, and the grantor was making commitments to mitigate injury therefrom if any should occur. As to minerals in no commercial demand, the injury was predictably slight because any use for local construction demands would be sporadic and minimal in quantity.

It appears to me that anyone who was called on to approve the title in 1935 (the Attorney General?) would have had to consider the dictionary meaning and assume it to be the legal meaning unless shown otherwise: that anything the clause might include, it did include. Otherwise he would be required to guess at the parties' intent. And the deal could not have been justified on the Government side unless the price was low enough to make it beneficial to the public interest even on the most unfavorable assumption. The grantor's reservation should have made it possible to grow many more acres of trees than could have been grown on the amount of land obtainable by buying a full fee simple, with expenditures of the same amount of money. If the United States had wanted to use the granted premises for, *e. g.,* a military post or a National Park, the reservation of such minerals as sandstone and clay would have been more difficult to reconcile with the intended use, and the argument that minerals not of commercial importance were excluded, would have had more persuasive force.

The decision throws the reservation language in this deed into such uncertainty of meaning that it will be impossible to use it in future deeds.

In my view the non-commercial character of the sandstone and clay deposits should have its effect, not on entitlement, but on quantum of recovery.

I would enter judgment for plaintiff on the trial judge's findings, and remand to the trial division for further proceedings under Rule 131(c), to determine quantum.