IT IS SO RECOMMENDED.

**Lyle COCHRAN, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 437–87 L.

United States Claims Court.

Feb. 8, 1990.

John P. Moore, Cut Bank, Mont., for plaintiffs.

Daniel G. Steele, Washington, D.C., with whom was Acting Asst. Atty. Gen. Donald A. Carr, for defendant.

Andrew M. Small, Billings, Mont., for third party defendant Rhinehart Tucker.

James L. Vogel, Hardin, Mont., for third party defendant Fort Belknap Community Council.

## ORDER

MOODY R. TIDWELL, III, Judge:

This is an inverse condemnation case which comes before this court on plaintiffs' Motion for Partial Summary Judgment and defendant's Cross–Motion for Partial Summary Judgment. At issue is whether the plaintiffs, as mineral estate owners, are owners of gravel on lands located on the Fort Belknap Indian Community Reservation, Montana. Plaintiffs have alleged that defendant wrongfully extracted, removed, and converted large quantities of valuable sand and gravel without any authority or consent from plaintiffs.

## FACTS

Plaintiffs are Indian wards of the United States and members of the Fort Belknap Indian Community. The United States holds the lands and mineral estate located on the Fort Belknap Indian Reservation for the benefit of various members of the Fort Belknap Indian Community. In the years 1974 and 1977, plaintiffs executed certain "Deeds to Restricted Indian Lands" which transferred the surface estate of these lands to purchasers, also Indians, but reserved "all minerals, including coal, oil and gas, together with the right to lease, extract and retain the same" to Indian plaintiffs.

In March of 1979, the Bureau of Indian Affairs (BIA) executed "Sand, Gravel, Pumice, and Building Stone" permits with the record surface owners on a forty acre portion of the land in dispute. The purpose of the permit was to supply the BIA with the sand and gravel necessary to construct a thirty-five mile road on the Fort Belknap Indian Reservation. The permits extended from March 16, 1979 to December 31, 1984. During that time, BIA removed 145,310 cubic yards of pit run gravel and 219,557 tons of crushed gravel. The surface owners were paid $63,784.63 for the gravel taken.

Because of their mineral interest in the lands from which the gravel was removed, Indian plaintiffs believed that they were entitled to compensation for the reasonable value of the gravel taken by defendant. Inherent in this assertion was that sand and gravel were minerals and thus included in plaintiffs' mineral interest. Accordingly, claims dated August 30, 1985 were filed with the BIA by plaintiffs for administrative settlement. Although plaintiffs asserted that it was not until August of 1984 that plaintiffs were informed of the sand and gravel extractions and that no other prior notice was given to any of the plaintiffs of the extractions, the administrative claims, on September 24, 1986, were denied. The BIA stated that plaintiffs' administrative claims were not filed within the time required by statute and that, regardless, claims would be more properly presented to this court under the Tucker Act. 28 U.S.C. § 1491. Plaintiffs then filed suit in the United States District Court for the District of Montana but that action was dismissed for lack of subject matter jurisdiction. *Cochran v. United States*, No. CV–86–216–GF (D.Mont. Apr. 27, 1987). The district court found that plaintiffs' action was one for inverse condemnation founded upon the Constitution. Because the claims exceeded $10,000, the court stated that jurisdiction over plaintiffs' claims was vested exclusively in the United States Claims Court. Plaintiffs filed their claims in this court on July 21, 1987. The parties then proceeded to submit cross-motions for summary judgment.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact

and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). In evaluating a motion for summary judgment, any doubt over whether a genuine issue of material fact exists must be resolved in favor of the non-moving party. *Housing Corp. of Am. v. United States*, 468 F.2d 922, 924, 199 Ct.Cl. 705 (1972); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). In addition, inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

The critical issue presently before the court is whether gravel is considered a mineral for the purposes of the mineral rights reservation, and therefore part of the mineral estate owned by plaintiffs. However, in order to reach the merits of that issue, the court must first address the statute of limitations issue raised by defendant.

### I. *Statute of Limitations*

It has long been settled that the conditions upon which the government consents to be sued must be strictly observed to avoid the prosecution of stale claims which can prejudice defendant. *Kirby v. United States*, 201 Ct.Cl. 527, 539 (1973), *cert. denied*, 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974). Therefore, the court must carefully scrutinize plaintiffs' claims in this light. The applicable statute, 28 U.S.C. § 2501 (1982), states: "Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." Defendant asserted in its Motion for Partial Summary Judgment that plaintiffs' claims first accrued more than six years prior to the July 21, 1987 United States Claims Court filing: the claims commenced on May 1, 1979 and

continued through December 31, 1984.[1] Therefore, defendant continued, plaintiffs' claims were time-barred.

The resolution of this issue depends upon the date which plaintiffs' claim first accrued. Case law has established that the date of accrual is "the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic S.S. Co. v. United States*, 165 Ct.Cl. 217, 225 (1964); *see also Kirby*, 201 Ct.Cl. at 532; *Sauer v. United States*, 354 F.2d 302, 304, 173 Ct.Cl. 642 (1965). In order for this action to avoid being barred by the statute of limitations plaintiffs' claim must have accrued after July 21, 1981.

Plaintiffs argued that their claim did not accrue until after the taking had completely stopped. They based this assertion on the alleged fact that it was not possible to ascertain the total amount or value of the gravel so converted until the taking was completed. Further, plaintiffs argued that they relied on the defendant to make an accounting and payment for the gravel when the taking was completed. Moreover, plaintiffs asserted they were unaware that they were being deprived of their property while the taking was going on, as the BIA had the duty to manage the property for them. According to plaintiffs their claim did not accrue, and the six year limitation did not commence to run, until July 21, 1984 when the taking was completed.[2]

It is true that in certain circumstances the statute of limitations may be tolled. *Braude v. United States*, 585 F.2d 1049, 1051, 218 Ct.Cl. 270 (1978); *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358–59, 178 Ct.Cl. 630, *cert denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967); *Nitol v. United States*, 7 Cl.Ct. 405, 414 (1985). However, mere ignorance of rights which should be

---

1. Though the sand and gravel permits were executed in March, 1979, the physical taking did not commence until May 1, 1979.

2. Plaintiffs state that the removal of gravel was completed on or about July 21, 1984, however defendant states that it was completed December 31, 1984. The confusion is due to defendant relying on the expiration date of the sand and gravel permits as the date on which the removal was completed, and plaintiffs on the actual date on which they estimate the removal was completed.

known is not enough to toll the statute of limitations. *See Navajo Freight Lines, Inc. v. United States,* 176 Ct.Cl. 1265, 1270 (1966); *Dion v. United States,* 137 Ct.Cl. 166, 167 (1956). To justify tolling the statute of limitations period, plaintiffs must show one of three things: (1) that plaintiffs' injury was "inherently unknowable" at the accrual date, (2) that defendant has concealed its action with the result that plaintiffs were unaware of its existence, (3) that the plaintiffs relied on a misrepresentation by the defendant. *Braude,* 585 F.2d at 1051; *Japanese War Notes,* 373 F.2d at 359; *Nitol,* 7 Cl.Ct. at 414.[3] Under the undisputed facts in the present action, and in accordance with the law, the court finds that plaintiffs were unable to satisfy any one of the three requirements.

Case law has held that the the type of injury that would qualify as inherently unknowable would be one akin to "when defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit." *Japanese War Notes,* 373 F.2d at 359. Under this theory, simply looking at the tree could not reveal the injurious contractual breach. "[T]he statute will not begin to run until plaintiff learns or reasonably should have learned of his cause of action." *Id.* In the instant case plaintiffs had ample opportunity to discover the injurious contractual breach. By simply noticing the physical removal of the gravel, plaintiffs reasonably should have known of their cause of action. Moreover, the record reflects that plaintiffs knew of the removal of the gravel before the sand and gravel permits expired on December 31, 1984. *See* Letter to Mr. Lyle Cochran from the Bureau of Indian Affairs (August 10, 1984).

Even if defendant could have concealed the removal of large quantities of gravel it did not do so, nor was there misrepresentation on the part of the government. For concealment and misrepresentation to toll the statute of limitations, plaintiffs must show that defendant concealed from them the existence of the circumstances which give rise to their alleged claims and that plaintiffs relied on defendant's representations such that plaintiffs were under the impression that there were no claims for plaintiffs to assert. *Nitol,* 7 Cl.Ct. at 414. Although plaintiffs were never specifically told that the gravel was being removed, the fact of removal was never hidden from plaintiffs, and, in fact, appears to have been common knowledge. Nothing presented to the court ever pointed to defendant making representations to plaintiffs which would lead plaintiffs to believe that they had no claim. Further, defendant showed its good faith by responding to questions plaintiffs had about the gravel which defendant removed.

■ The plaintiffs also claimed that because of the relationship between the Indian ward plaintiffs and their guardian, defendant, the statute of limitations was tolled. Plaintiffs argue that they are entitled to rely on and have actual notice from the defendant, as "trustee," of any actions adversely affecting their interest, such as the taking of the gravel. Plaintiffs cite to case law which exemplifies the close relationship of the government to the Indians. *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *United States v. Oneida Nation of New York,* 477 F.2d 939, 943 (Ct.Cl.1973); *Assiniboine & Sioux Tribes v. Nordwick,* 378 F.2d 426, 429 (9th Cir.1967), *cert denied,* 389 U.S. 1046, 88 S.Ct. 764, 19 L.Ed.2d 838 (1968). However none of the cited cases address the tolling of the statute of limitations. All deal only with the duty of the government in general vis-a-vis Indians. Relevant case law holds that the existence of a real or purported "trust" relationship does not toll the statute of limitations when the plaintiff has actual or constructive notice of the claim.[4] *See Menominee Tribe*

---

**3.** On this issue, plaintiffs cite only to cases which are not helpful to the court nor binding on the court as they address different statutes of limitation than the statute at issue in this case. As demonstrated above, there is an abundance of case law binding on this court which directly addresses the statute of limitations at issue.

**4.** Plaintiffs here characterize the relationship between the tribe and the government as one of a "trust," the Indians being the trust benefi-

*of Indians v. United States,* 726 F.2d 718, 721 (Fed.Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984). "[S]uspicion once aroused may not be ignored. Thus the Indian beneficiary ... no less than any other, is charged with notice of whatever facts an inquiry appropriate to the circumstances would have uncovered." *Mitchell v. United States,* 10 Cl.Ct. 63, 68 (1986) (citation omitted). Indians cannot bring stale claims where the facts would be "available to the Indians if they sought advice." *Menominee Tribe,* 726 F.2d at 721. "The statute of limitations applies to Indians the same as to anyone else." *Fort Mojave Tribe of Indians v. United States,* 210 Ct.Cl. 727, 728, 546 F.2d 429 (1976). The court cannot ascribe to a theory that would allow Indians or tribes to know of a suspected wrong to themselves and simply stand mute with that knowledge until damage is done and then look to the United States for redress. At some point those with knowledge, or who should have known of the wrong, must step forward with that information if for no other purpose to mitigate the damage.

The court is not unmindful of plaintiffs' position. However, as this court has previously stated:

> The very nature of statutes of limitations is that they deny a claim regardless of its merit. This often seems unfair. But it is the judgment of those vested with the authority to make our laws that such statutes are necessary in order to insure prompt handling of claims and to prevent actions from being withheld until such time that the memories of witnesses and other types of evidence have become obscured or unavailable by the passage of time. Furthermore, the policy considerations behind such statutes contemplate that ignorance of rights which should have been known is not enough to toll their running.

*Braude,* 585 F.2d at 1054.

■ Plaintiffs' claim cannot be found to have been "inherently unknowable" or misrepresented or concealed by the defendant. To hold otherwise would declare the impossible to be possible and do violence to precedent. Consequently the statute of limitations may not be tolled and this court does not have jurisdiction over any of plaintiffs' claims which occurred prior to July 21, 1981, six years before this suit was filed. 28 U.S.C. § 2501 (1982).

## II. *Characterization of Gravel*

There are two authorities which address whether gravel is included as a mineral for the purposes of the plaintiffs' mineral interest: state law and federal law.[5]

---

ciaries and defendant the trustee. With this phraseology comes the concept of a relationship similar to a bank trustee and its extremely high, ever-continuing, exacting duty to its trustee. Under Indian Treaty Law the actual relationship is that of a guardian-ward. The difference may be but a matter of degree but a guardian is not generally presumed to be held to the same standards as a trustee. The duty of a guardian is to protect the rights of its wards and to help the wards grow and mature to a point where they can begin, and finally, take control of their own destiny. Not only is the relationship less exacting, it is intended to grow looser over the years until, eventually, the ward can take control over his or her own life. It is not the same as the high, continuing relationship of a trustee to its beneficiaries. The concept can be identified here as a "trust" relationship but that coined phrase should not mislead the court about the duty of the government.

5. As a side issue, plaintiffs allege that defendant conceded that gravel was a mineral for the purposes of this case. In a memorandum a BIA official stated to his supervisor:

> Given the recent court decisions and subsequent policy changes which apparently place gravel in the mineral estate, Mr. Cochran has requested payment, with interest, for his share of the mineral ownership.
> We are requesting your assistance in determining the following:
> 1. Are the mineral owners eligible for payment on sand and gravel permits?
> 2. If so, will that apply to expired as well as current permits?
> 3. What procedures must be followed in processing these claims, and how will interest be determined?

Memorandum from the Superintendent Fort Belknap Agency Bureau of Indian Affairs to the Area Director Billings Area Office (August 14, 1984). The court, however, does not agree that this memorandum evidences that the BIA acknowledged gravel as being part of the mineral estate of the plaintiffs. The phrase "which apparently place gravel in the mineral estate" is not an indication of the BIA's acknowledgment that gravel is a mineral. With that phrase, the memorandum is merely stating the facts which

### a. The Application of State Law

■ Defendant claimed that, based on state law, plaintiffs must prove by extrinsic evidence that the parties intended to reserve to plaintiffs sand and gravel as minerals. State law allegedly applies because, in the absence of federal common law and when there is no specific federal statute, federal courts look to relevant state law to determine which property rights are conveyed or retained. Primarily, defendant relies on *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 671–76, 99 S.Ct. 2529, 2539–42, 61 L.Ed.2d 153 (1979), for this proposition. In *Wilson*, the dispute arose due to changes in the course of the Missouri River. When the Omaha Indian Tribe was established in Nebraska in 1854, its eastern boundary was fixed at the center of the Missouri River. However, in 1867, a General Land Office survey established that because the course of the river had changed, certain tribal lands were then located on the Iowa side of the river, as opposed to their original location in Nebraska. After this change in the river's course, residents of Iowa settled on and improved some of the property which was previously on the Nebraska side of the river. In a suit to settle the property rights between the Iowa riparian owners and the Indian tribe, the United States Supreme Court held that although federal law governed the substantive aspects of the dispute, state law should be borrowed as the federal rule of decision to determine whether there had been an avulsion or an accretion of the river.[6]

Defendant misconstrued *Wilson*. The court in *Wilson* borrowed state law only because of the particular factual circumstances of that case. Those factual circumstances are not present in the instant case.

In *Wilson*, there were private parties involved who were entitled to have their rights protected under state law. There are no similar private parties in the present case. On the contrary, it is the federal government being sued by individuals, who by their nature as Indians have limited rights to be protected by the federal government. The *Wilson* court reasoned:

> This is also an area in which the States have substantial interest in having their own law resolve controversies such as these. Private landowners rely on state real property law when purchasing real property, whether riparian land or not. There is considerable merit in not having the reasonable expectations of these private landowners upset by the vagaries of being located adjacent to or across from Indian reservations or other property in which the United States has a substantial interest. Borrowing state law will also avoid arriving at one answer to the avulsive-accretion riddle in disputes involving Indians on one side and possibly quite different answers with respect to neighboring land where non-Indians are the disputants.

*Wilson*, 442 U.S. at 674, 99 S.Ct. at 2541. In the present case there is no risk of having private landowners "upset by the vagaries of being located adjacent to or across from Indian reservations ..." which would necessitate the application of state law. Purely federal interests are involved; necessarily, federal law is applicable. *Id.* at 670, 99 S.Ct. at 2539 ("Indian title is a matter of federal law ...").

Consequently, defendant's claim, based on Montana state law, that plaintiffs must prove by extrinsic evidence that the parties intended to reserve to the plaintiffs' sand

---

apparently led Mr. Cochran to believe that he was entitled to payment. This is supported by the next question the memorandum poses: whether mineral owners are eligible for payment on the sand and gravel permits. That would not be a question if the BIA had acknowledged that gravel is a mineral.

**6.** In an accretion, portions of soil are added by gradual deposition to that already in possession of the owner through the operation of natural

causes, such as through the action of the sea or a river; thus the boundary is changed between riparian owners. *Willett v. Miller*, 55 P.2d 90, 92 (Okla.1935). In an avulsion there is a loss or addition to land by the action of water, and the boundary does not change between riparian owners; land lost on one side of a river is gained on the other side of the river. *Arkansas v. Tennessee*, 246 U.S. 158, 165, 38 S.Ct. 301, 62 L.Ed. 638 (1918).

and gravel as minerals under state law, is without merit.

### b. *The Application of Federal Law*

■ Having concluded that federal law governs this action, the only issue left to resolve is whether, pursuant to the plaintiffs' Motion for Partial Summary Judgment, plaintiffs, as mineral estate owners, are owners of the gravel on the lands located on the Fort Belknap Indian Community Reservation.

Plaintiffs rely on *Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), for the proposition that gravel is a mineral for the purposes of plaintiffs' mineral interest. *Watt* held that gravel is included as a mineral under the Stock–Raising Homestead Act (SRHA). Defendant contends that this definition of mineral in *Watt* was restricted solely to SRHA lands. We hold, however, that though defendant is technically correct, the rationale the court used in *Watt* can equally apply in the instant case to conclude that gravel is a mineral for the purposes of the plaintiffs' mineral interest.

Throughout its opinion in *Watt,* the United States Supreme Court stressed that

[f]or a substance to be a mineral reserved under the SRHA, it must be not only a mineral within one or more familiar definitions of that term, as is gravel, but also the type of mineral that Congress intended to reserve to the United States in lands patented under the SRHA.

*Watt,* 462 U.S. at 44, 103 S.Ct. at 2223. The underlying purpose of the SRHA was found to support the government's contention that the mineral reservation in that Act included gravel. The primary purpose of the SRHA was to enable homesteaders to use SRHA lands for stockraising and raising crops. Accordingly, homesteaders were not allowed to develop the subsurface resources of the SRHA lands because that would be inconsistent with the underlying purpose of ranching and farming. Thus, it was necessary for Congress to sever the surface estate from the mineral estate. Therefore, gravel was necessarily included as part of the subsurface estate to the extent to which it could not be used for ranching or farming.

The same rational as used by the Supreme Court has been used by other courts in similar cases. *Cumberland Mineral Co. v. United States,* 513 F.2d 1399, 206 Ct.Cl. 797 (1975); *Millsap v. Andrus,* 717 F.2d 1326 (10th Cir.1983); *Marshall v. Cedar Lake Sand & Gravel Co.,* 480 F.Supp. 171 (E.D.Wis.1979). *Millsap* involved a mineral reservation in favor of an Indian tribe pursuant to an Act of Congress. The surface owners appealed from the judgment of the United States District Court ruling that the mining of dolomite fell within the meaning of a reservation of oil, coal, gas, or "other minerals." In deciding what constituted a mineral for the purposes of the reservation, the court looked to *Watt* and concluded that contemporary definitions of "minerals" were unclear. Therefore, on the basis of *Watt,* it was necessary to look to the purposes of the Act and the underlying circumstances for guidance in determining what Congress intended to reserve to the tribe. The court found nothing in the scheme or the legislative history which suggested any intent to limit the mineral reservation; therefore, the mining of dolomite fell within the meaning of the reservation. The court stated: the minerals in question "are inorganic substances that can be removed from the soil and used for commercial purposes, and there is no reason to suppose they were intended to be included in the surface estate." *Millsap,* 717 F.2d at 1329.

In *Marshall,* the court had to decide whether sand and gravel were minerals for the purposes of the Federal Mine Health and Safety Act of 1977 (FMSHA). The court used the same rationale as that used in *Watt* and *Millsap.* The court looked to the underlying purpose and circumstances of the FMSHA based on its legislative history:

With regard to the first issue [whether the defendant's sand and gravel company is covered by the provisions of the FMSHA], the starting point of my analysis is 30 U.S.C. § 802(h)(1) which pro-

vides that "'coal or other mine' means (A) an area of land from which minerals are extracted in nonliquid form...." With regard to this definition, the Senate committee stated that "what is considered to be a mine and to be regulated under this Act" is to be given the broadest possible interpretation and that doubts are to be resolved in favor of inclusion of a facility within the coverage of the Act.

*Marshall,* 480 F.Supp. at 173. Based on this definition and the legislative history, the court concluded that sand and gravel were minerals within coverage of FMSHA.

This court agrees with defendant that the definition of minerals in *Marshall* cannot be used as a blanket definition. However, as in *Watt,* the rationale of the *Marshall* court in construing the definition is relevant to this court's analysis. Just because there is neither a statute nor an Act of Congress involved in this case does not mean that the rationale of *Watt, Millsap,* and *Marshall* is inappropriate.

The same rationale as used in *Watt, Millsap,* and *Marshall* was also used in a case more particular to the circumstances here. In *Cumberland Mineral Co. v. United States,* 513 F.2d 1399, 206 Ct.Cl. 797 (1975), the Corps of Engineers purchased only the surface estate and the seller retained the mineral interest. Pursuant to its acquisition, the Corps mined clay and sandstone from the land. The transferee of the reserved mineral interest sued, alleging a taking of its interest in the sandstone and clay. The court ruled for the defendant. It found that in construing mineral reservations and conveyances, "'each determination must be made in the light of the language of the particular instrument together with the circumstances and conditions existing at the time.'" *Cumberland,* 513 F.2d at 1401 (quoting *Dierks Lumber & Coal Co. v. Meyer,* 85 F.Supp. 157, 162 (W.D.Ark.1949)). The court concluded that it could not have reasonably been within the contemplation of the parties to denote clay and sandstone as minerals as that would have defeated the purpose of the land transaction. The land had been transferred to the government in order that such land could be used for the growing of trees. Clay and sandstone were the principal components of the geological formation of the area. If the sandstone and clay were determined to be minerals, there would be nothing left for the surface owner except a vast chasm. Trees could not be grown if the surface was removed. *Cumberland,* 513 F.2d at 1402.

From *Watt, Millsap, Marshall,* and *Cumberland* it is clear that in construing a mineral reservation, courts must look to the underlying circumstances and conditions existing at the time the reservation is entered into. Using this standard, this court finds that gravel is mineral for the purposes of this case.

The Fort Belknap Indian Reservation lands have never been classified by the authorizing legislation or by the Department of the Interior as SRHA lands. But, as the Supreme Court reasoned in *Watt,* it is the underlying purpose and use of such lands which is telling in determining whether or not gravel should be considered a mineral. Stock-raising is one of the principal economic activities on the Fort Belknap Indian Reservation, as the lands are primarily suitable only for stock-raising. The Fort Belknap Reservation was specifically created for the purpose of enabling the tribe therein to become self-supporting as a pastoral and agricultural people. Act of May 1, 1888, ch. 213, 25 Stat. 113, 124 (1888). It appears from the evidence presented to the court that ranching was the primary use of the land even at the time the mineral interest was reserved. Nothing before the court showed that the surface owners intended to use the surface estate to remove subsurface gravel. The surface owners appear to have had no reason to remove the gravel as a condition, requirement or desire to the normal ranching use of the surface estate. The sole apparent reason for removal of the gravel here was for road construction purposes. As was the case in *Watt,* to allow the surface owners of the land here to develop the subsurface estate would be inconsistent with the normal usage of the land. In this light, the mineral reservation is not ambig-

uous. There is nothing in the circumstances surrounding the mineral reservation which indicates to the contrary.[7]

Moreover, the mineral reservations themselves, in the Deeds to Restricted Indian Land, state: "[reserving to] the United States of America in trust for ... [plaintiffs] together with the right to lease, extract and retain the same, all minerals, including coal, oil, and gas...." Absent special circumstances, it is evident from this language that plaintiffs were the ultimate owner of the mineral interest who had the right to "lease" and "extract" "all minerals." Defendant therefore should have recognized the "ownership" rights of plaintiffs and included provisions in the sand and gravel permits to safeguard their interests, such as royalty payments, or, if plaintiffs so chose, refused to have executed the permits.

This court's holding is also consistent with the cases that have used "value" to determine the minerality of a substance. *Estate of Charles O. Fairbank v. United States*, 164 Ct.Cl. 1, 10 (1964); *United States v. Isbell Constr. Co.*, 78 I.D. 385, 394–396 (1971); Op. Solicitor M–36379 (Dep't Interior Oct. 3, 1956). In *Fairbank*, the court stated that the test of minerality is whether the known conditions on the appropriate date are such as reasonably to engender the belief that the lands contain minerals of such quality and quantity as would render their extraction profitable and justify expenditures to that end. In *Isbell Constr.*, the Solicitor stated that "valuable" deposits of gravel were minerals and could be reserved to the United States under a reservation of minerals. *Isbell Constr.*, 78 I.D. at 390. In the Solicitor's Opinion, because gravel could be sold at a profit, it would be considered a mineral, "[t]hese concepts of 'value' and 'existence of a market' have also been long applied by the authorities in construing mineral reservations in grants of private lands...." Op. Solicitor M–36379 at 3 (citations omitted).

The gravel in the present case was removed to construct a road and a substantial dollar amount was paid for that gravel. Certainly that gravel can be considered to be "valuable" within the meaning of the above cited authority.

## CONCLUSION

The court concludes that plaintiffs' claims accruing more than six years prior to their July 21, 1987 filing in this court are time-barred by the statute of limitations. Furthermore, the court concludes that plaintiffs do not have to prove by extrinsic evidence that the parties intended to reserve to the grantor-plaintiffs sand and gravel as minerals because state law does not govern this case. Under federal standards, established by *Watt, Millsap, Marshall,* and *Cumberland,* and in accordance with the "value" standard used by this court and others during the mid–1900's, the court concludes that gravel is a mineral for the purposes of this case. Defendant's Cross–Motion for Partial Summary Judgment is partially granted and partially denied. Plaintiffs' Motion for Partial Summary Judgment is granted.

IT IS SO ORDERED.

---

7. Furthermore, this court's holding is supported by footnote 7 in *Watt.* There, the Supreme Court stated that in a comprehensive study of the public lands in 1913, the Interior Department listed gravel as a mineral. *Watt,* 462 U.S. at 46, n. 7, 103 S.Ct. at 2224, n. 7 (citation omitted).